[No. S019708. June 22, 1998.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES DAVID MAJORS, Defendant and Appellant.

COUNSEL

Richard Power and Elizabeth Barranco, under appointments by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Alison Elle Aleman and Alan Ashby, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**BROWN, J.**—A jury found defendant James David Majors guilty of the first degree murders of Thomas Probst, Jeanine Copeland, and Patrick Mungavin (Pen. Code, §§ 187, subd. (a), 189)[1] and of first degree robbery (§§ 211, 212.5, subd. (a)). The jury also found defendant had personally used a firearm during the three murders and the robbery. (§ 12022.5, subd. (a).) In addition, the jury found true special circumstance allegations that defendant murdered the victims during the commission of a robbery (§ 190.2, subd. (a)(17)) and committed multiple murders (*id.*, subd. (a)(3)). Defendant was sentenced to death. This appeal is automatic. (Cal. Const., art. VI, § 11; § 1239, subd. (b).) For the reasons discussed below, we affirm the judgment in its entirety.

## I. FACTS

### A. *Guilt Phase Evidence*

#### 1. *Prosecution Evidence*

Donald Hobbs, who was 10 years old at the time of trial, lived in a house on Kaula Drive in the Sacramento suburb of Fair Oaks with his mother, Jeanine Copeland (Copeland), and Thomas Probst (Probst), her live-in companion. On the morning of January 26, 1989, after finishing his breakfast, Hobbs found Copeland lying on the floor and noticed blood next to her head. When Hobbs was unable to awaken her, he called "911."[2] Sheriff's deputies responding to the scene discovered the bodies of Copeland, Probst, and Patrick Mungavin (Mungavin).

---

[1]All further statutory references are to the Penal Code unless otherwise indicated.

[2]The parties stipulated that in an earlier statement, Hobbs told detectives he had previously gotten up at approximately 4 to 5 a.m. to get a drink of water and go to the bathroom. He found the front door wide open and noticed that Probst's TransAm was not there. When authorities responded to Hobbs's call, the TransAm was parked outside the residence.

Copeland was lying facedown on the living room carpet. She had been struck by a gunshot, fired at close range, that entered at her right temple and exited on the left side of her neck. A forensic pathologist testified that such a wound would have caused an immediate loss of consciousness and that death would have ensued within a matter of minutes. In his opinion, Copeland had been killed between midnight and 6 a.m. on January 26. Tests of Copeland's blood showed evidence of methamphetamine use.

Mungavin was seated on the living room couch with his hands folded in his lap, his head over to one side, and blood coming from his right nostril. He had a loaded .22-caliber handgun under his left armpit, but there was no evidence that the handgun had been fired. Mungavin had suffered multiple gunshot wounds, including a fatal wound to the back of his head. The forensic pathologist estimated the time of Mungavin's death to be between midnight and 6 a.m. on January 26; he could not determine to a medical certainty that Mungavin had been shot at the location where his body was found. Although Mungavin had methamphetamine on his person, there was no evidence of either drugs or alcohol in his system. A criminalist testified that .38-caliber bullets removed from Mungavin's body had most likely been fired from either a ".38 special" or a .357 magnum. A hollow-point slug found underneath Mungavin's right leg, between his leg and the couch, appeared to have been fired from the same weapon.

Probst was lying on the floor of a bedroom that had been turned into an office. Probst had sustained a fatal wound to his left cheek by a gunshot fired at close range. He also suffered an abrasion to the right side of his face consistent with falling as a result of the gunshot wound. The forensic pathologist estimated the time of Probst's death to be between midnight and 5 a.m. on January 26; he could not be certain that Probst had been shot at the location where his body was found. Probst's blood tested positive for Valium and methamphetamine. A criminalist testified that an expended .32-caliber bullet removed from the right side of Probst's neck had been fired from either a .32-caliber semiautomatic pistol or a .32-caliber revolver. The contents of a wallet were strewn about the office, and Probst's pants pockets were pulled out.

In the office where Probst's body was found, deputies found evidence of drug sales, including a scale, packaging material, a cutting agent, a pay-owe sheet, and powder residue on the surface of a mirror. Deputies also found a loaded, sawed-off .12-gauge shotgun leaning up against the wall in the corner of the room. A number of witnesses confirmed that Probst was a methamphetamine and marijuana dealer.

In the hallway of the residence, deputies found a screwdriver, a hammer, and a strongbox or safe that appeared to have been pried open. They also

noted a depression in the carpet of the office closet floor that was approximately the same size as the strongbox or safe. Probst was known to keep a safe in this location, where he stored jewelry, drugs, and proceeds from drug sales. Although both Probst and Copeland were known to wear jewelry, there was no jewelry on their bodies except for an anklet around Copeland's ankle. Jewelry boxes in the residence were empty, and there was evidence of ransacking. There was no sign of forced entry into the residence itself and no evidence of a struggle.

During the course of their investigation, deputies alerted Probst's parents to the possibility of an Arizona connection to the homicides. Subsequently, while going through Probst's belongings, his mother found a note with the name "Robert Reese" and the address 14031 North 72d Lane in Peoria, Arizona. According to Probst's mother, the note was not in his handwriting.

At trial, the prosecution theorized that the three victims had been killed by defendant and Robert Reese (Reese) during the course of a drug-related robbery. The prosecution offered extensive circumstantial evidence in support of this theory.

In December 1988, Reese lived in a house on 72d Lane in Peoria, Arizona. Defendant also had a room at the house, although it was not his primary residence. Both defendant and Reese moved out shortly after Christmas of 1988.

According to a neighbor of Reese's aunt, defendant and Reese visited the aunt at her apartment in Rancho Cordova, near Sacramento, sometime between December 27 and December 29, 1988, at approximately 10:30 to 11 p.m. Reese was acting in a hyperactive fashion and appeared to be under the influence of drugs. Other witnesses confirmed that Reese sold and used methamphetamine. Reese was also known to carry firearms.

Several witnesses testified that Probst was planning to conduct a drug transaction with someone from out of state the night he was killed. Probst's brother, Wayne Probst, who was at Probst's house until about 9:20 or 9:30 p.m. on January 25, 1989, testified that Probst told him he had arranged a deal to sell a pound of methamphetamine later that evening. According to Wayne Probst, his brother had an established clientele and dealt only with customers he knew.

James Pluskett, who talked to Probst on the telephone between 8 and 10 p.m. on January 25, offered similar testimony regarding Probst's plans to sell $10,000 worth of methamphetamine to someone who was flying in from Las

Vegas. Pluskett understood this to be about a pound of methamphetamine. He thought two people were involved in the purchase, the person actually making the purchase and the person providing the money. Pluskett assumed these were the same regular customers from Arizona who purchased a half-pound of methamphetamine from Probst every couple of weeks.

Freddie Gregg, who was at Probst's house until about 11 or 11:30 p.m. on January 25, testified that Probst told him he was expecting a visit from someone from Arizona who would be bringing drug paraphernalia. During Gregg's visit, Probst took him into the kitchen and showed him a plastic freezer bag filled with methamphetamine. The bag was approximately the size of a tissue box.

Sandra Morgera, who was at Probst's house until about 11:15 or 11:30 p.m. on January 25, testified that Probst told her he had another two deals scheduled that night, one of which was a deal with Gregg, which occurred before she left. The second deal was a $10,000 deal with people from Arizona for a pound or a pound and a half of drugs. On cross-examination, Morgera admitted she might have gotten the $10,000 figure from newspaper articles about the case, admitted Probst had told her about both a drug purchase and a drug sale scheduled for that evening, and admitted it was not until trial that she stated one of the two deals was the deal with Gregg.

Catherine Bailey, who spent the day at Probst's house on January 25, testified that Probst told her he had just bought a pound of methamphetamine and was planning to conduct a drug transaction with someone from Arizona. According to Bailey, Probst told her he had completed another transaction with the same person about a month earlier and the person felt he had been "burned." Although she was unclear as to how she acquired the information, Bailey identified the person as Robert Reese of Peoria, Arizona.[3] Before Bailey left, Probst had her sample the methamphetamine to make sure it was okay. While Bailey was in Probst's office, she saw a large amount of cash. Probst told her it was about $2,000.

Several witnesses from Arizona offered details regarding a trip defendant and Reese had taken to California. Michelle Blouir, Reese's former girl-friend, testified that defendant and Reese had taken an evening trip to California sometime in January. Shortly before they left, Blouir saw defendant with two brand new pairs of dark cotton garden-type gloves still in their

---

[3]Sally Rojic confirmed that Reese had previously purchased methamphetamine from Probst at the Kaula Drive residence.

original packaging. She watched defendant hand one of the pairs to Reese.[4] Later, on Valentine's Day, while Blouir was talking on the telephone to a detective from Sacramento, Reese asked whom she was talking to. When she told him, he appeared frightened, bolted out of the apartment, and drove away. To the best of her recollection, defendant and Reese's trip to California had been about two weeks earlier. Blouir also talked to defendant about a week after he came back from the trip. He told her he had gone to California to get drugs and that Reese had left him in a motel room for six hours and had never come back, so defendant flew back home.

Kristi Crancer, a friend of Blouir, verified the timing of the trip, testifying that it had occurred about a week after her January 19, 1989, graduation. When Reese returned from the trip, he showed Crancer jewelry, a plastic bag of drugs, and two handfuls of money. Crancer also confirmed that Reese had left abruptly when he found out that Blouir was talking to a detective from Sacramento.

The parties stipulated that if Karen Brott were called as a witness she would have testified that Reese showed her a plastic bag of drugs, a large amount of cash, and two items of jewelry after he returned from Sacramento. Reese told her the bag contained a quarter- or half-pound of methamphetamine and that he had approximately $12,000 in cash. Reese later called Brott on February 14, 1989, and asked her if anyone was looking for him.

Richard Hartley, a housemate of defendant at the residence on 72d Lane, testified that defendant was involved in both the methamphetamine and gun trades.[5] When defendant used methamphetamine, he ingested the drug by sprinkling it on tissue paper, which he then wadded up and ate. Hartley acknowledged he had previously told investigators only about "suspicions" defendant used methamphetamine and had not told them about being involved in several drug transactions with defendant. On February 14, 1989, detectives from Sacramento came looking for Reese as a suspect in a triple homicide. After meeting with the detectives, Hartley met with defendant, who told him about a trip he and Reese had taken to Sacramento. According to defendant, he had sold a pound of marijuana there. Defendant told Hartley he had stayed in a motel room with a prostitute and that Reese was gone overnight with their rental car. When Reese returned the next day, he was acting in a paranoid fashion and said he wanted to go home. Defendant and Reese ended up taking separate flights home.

---

[4] None of the fingerprints found at the crime scene matched those of defendant or Reese.

[5] Sean McMillan, another housemate of defendant, offered similar testimony, although it was McMillan's understanding that defendant was a moneyman who did not actually participate in drug deals himself.

Defendant offered his own account to Robert Bell, a homicide investigator for the Sacramento County Sheriff's Department, during a February 17, 1989, telephone conversation. A tape recording of this conversation was played to the jury. During the conversation, defendant told Bell he had gone to Sacramento with Reese about a month earlier, selling a pound of marijuana for $1,400, $300 of which he gave to Reese.[6] Once they arrived in Sacramento, defendant rented a car and they drove to a Denny's restaurant.[7] At the restaurant, defendant gave Reese the marijuana, and Reese left, returning 20 to 40 minutes later. When Reese returned, they went to a motel and spent the night in a room with a prostitute named Bonnie. After dropping Reese off at the airport the next morning, defendant spent the day with Bonnie, taking her shopping. Defendant flew home that night. Defendant admitted he had taken a "380" gun with him on the trip.[8] Defendant told Bell he had taken another trip to Sacramento about three months earlier, buying a quarter pound of methamphetamine during that trip.[9]

Bonnie Hogue, a Sacramento prostitute, placed defendant and Reese in the Sacramento area at the time of the homicides. On the evening of January 25, 1989, Hogue was soliciting clients at a local truck stop. On January 26, between 2 and 3 a.m., Hogue finished her evening's work and returned to her motel room across the street. As she headed towards her room, Hogue was approached by Reese, who introduced himself as "Albert" and asked if he and defendant could stay in her room. Reese later admitted that his real name was Robert. Reese explained that he did not want to use his identification to rent a room, and the motel would not rent him one without it. After

---

[6]At trial, the prosecution offered testimony that marijuana sold for between $500 and $700 per pound in the Sacramento area in January 1989. Records seized during a search of defendant's residence reflected expenses for the trip well in excess of $1,400.

[7]Airline records introduced at trial stated that on January 25, 1989, a "Robert Reese" and a "James Majors" had taken a flight from Phoenix to Las Vegas, where they transferred to another flight to Sacramento. The second flight arrived in Sacramento at approximately 11:55 p.m. Rental car records introduced at trial stated that a "James David Majors" from Phoenix had rented a car at Sacramento Metropolitan Airport on January 26, 1989, at 12:03 a.m. The car was returned the same day at 5:42 p.m. Parking lot records introduced at trial stated that defendant's pickup truck was parked at the Phoenix airport from 8:51 p.m. on January 25, 1989, until 9:42 p.m. the next day.

[8]Following the interview, defendant's wife provided Bell with the .38-caliber weapon defendant claimed to have taken to Sacramento. Two more .38-caliber weapons were seized during a search of defendant's residence. None of these weapons were involved in the homicides.

[9]Telephone records introduced at trial showed a collect telephone call from a pay telephone in Sacramento to defendant's residence in Phoenix on January 3, 1989. They also showed a telephone call from defendant's cellular telephone to Probst's residence on November 22, 1988.

Reese paid Hogue $500, she agreed. Defendant and Reese brought three bags of luggage into the motel room.

Once in the room, defendant pulled a plastic bag of methamphetamine out of the piece of luggage he had carried in and passed the bag to Reese. Reese snorted some of the drug, and defendant ingested some by sprinkling it in his coffee and by rolling it up in a piece of toilet paper and eating the paper. During the course of conversation, the men told Hogue they had come in from Arizona around midnight, although Reese was originally from Rancho Cordova. Defendant told Hogue they had just completed a $10,000 or $15,000 drug deal, had bought some guns, and had sold a Harley-Davidson motorcycle.

Hogue became frightened when she noticed the butt of a gun sticking out of the bag defendant had carried in. When Hogue asked that the gun be removed from the motel room, the two men took the bag out to the car, removed the gun, and brought the bag back in. Hogue searched the bag to make sure the gun had been removed, observing methamphetamine, money, and jewelry in the process. Reese appeared very nervous, was sweating a lot, and kept peering out the window.

Eventually, Reese paid Hogue $200 to engage in sexual activity with defendant in the shower. As she left the bathroom, Hogue found Reese sitting on the floor of the motel room dividing methamphetamine, money, and jewelry into two piles. Reese handed some of each to defendant, telling defendant the money was what he owed him.

Defendant and Reese discussed whether to drive or fly back to Arizona, eventually deciding to fly back separately. Defendant and Hogue dropped Reese off at the airport about 5 a.m. that morning. Before he left, Reese gave Hogue another $200 to keep his "partner" company. Defendant and Hogue returned to the motel room, and defendant paid for Hogue to rent the room for another day.

Defendant told Hogue he needed to send some things back to Arizona he could not take on the airplane and asked her the location of a Greyhound bus depot. Defendant paid her $250 to help him ship the items, which included a gun defendant said he had purchased during the trip. After getting a box at a Chinese restaurant, defendant packed up his things and they proceeded to the Greyhound station. Hogue used her birth certificate, which was issued in her maiden name Bonnie Starr, as identification to mail the package. As instructed by defendant, Hogue identified the contents of the package as

"books" and addressed it to a "Stanley Johnson" in Phoenix.[10] After Hogue sent the package, defendant took her clothes shopping; although Hogue claims he spent $300 to $400 on her, store receipts showed total sales of only $225.05 for that day, the largest single sale of which was $63.

Later that day, defendant had Hogue call and book him a return flight to Phoenix under the name "Stanley Johnson."[11] They left for the airport about 5 p.m. After defendant returned his rental car, he caught his flight home. Before he left, defendant wrote his cellular telephone and pager numbers down in Hogue's telephone book and made arrangements to call her in a few days. After defendant left, Hogue returned to the motel room, where she found a pair of soft brown gardening gloves. Although Hogue retrieved the gloves and took them home, she could not recall what she had done with them.

When defendant called Hogue a few days later, he told her he had received the package she had sent and asked her to come to Arizona to perform prostitution services for him. Hogue eventually agreed to make the trip and did so on February 4 or 5. A few weeks after returning from Arizona, Hogue read a newspaper article about a triple murder in Fair Oaks. The article contained a picture of Reese. After reading the article, Hogue was scared, picked up the telephone, and called the authorities. When she first contacted them, Hogue was unaware that a reward had been offered in the case, although she later accepted a $2,500 reward after detectives suggested she apply for it. The same day she read the newspaper article, Hogue received three or four telephone messages from defendant, who was persistent about needing to talk to her. Prior to testifying at defendant's preliminary hearing, Hogue was granted immunity in exchange for her testimony.

On cross-examination, Hogue was challenged on a number of collateral matters, including statements she had previously given to the authorities about being a truck driver and about her husband being a highway patrolman. She was also questioned about the fact that some of the information she provided the authorities was contained in the newspaper article she had read about the case. In addition, Hogue was impeached with certain inconsistencies between her trial testimony and statements she had previously given, such as the timing of when she saw the gun in the motel room, whether both

---

[10]Greyhound records introduced at trial confirmed that on January 26, 1989, a package had been sent from a "Bonnie Starr" of West Sacramento to a "Stan Johnson" of Phoenix. The contents of the package were listed as "book."

[11]Airline records introduced at trial stated that on January 26, 1989, a "Stanley Johnson" had taken a 6:35 p.m. flight from Sacramento to Phoenix. The flight reservation was made over the telephone by a person identifying herself as "Bonnie Hogue."

defendant and Reese left to take the gun out to the car, where she and defendant got the box for the package they sent to Phoenix, and details about her trip to Arizona. Hogue attributed several inconsistencies to the fact she was very upset the night she first talked to the authorities.

### 2. Defense Evidence

Denise Madsen testified that on January 25, 1989, she was working the night shift at a Denny's restaurant. During the late night hours of January 25 or the early morning hours of January 26, defendant and another individual came to the restaurant. The second individual left for about 45 minutes to an hour and returned in a "shook up, kind of spaced out" state wearing different clothes. Madsen testified, "It had to be before midnight." On cross-examination, Madsen admitted she had no independent recollection of the exact date she had seen defendant and that the only reason she remembered the date of January 25 or 26 was that "everybody keeps asking me the same dates and they've been consistent." She also admitted she had not previously told the district attorney's investigator the second man had left the restaurant and come back in different clothes, explaining she had been tired at the time of the interview.

### B. Penalty Phase Evidence

The prosecution called two witnesses who testified as to the facts underlying defendant's 1972 conviction for first degree burglary and his 1977 convictions for robbery and kidnapping. The defense called defendant's biological parents, who briefly described his upbringing by his maternal grandmother and asked the jury to spare their son's life. They also described incidents in which defendant had hurt his back in an automobile accident, had his work tools stolen, and had lost a finger as a result of a rattlesnake bite.

## II. DISCUSSION

### A. Guilt Phase Issues

#### 1. Admission of Hearsay Evidence

Defendant asserts that he was denied his statutory and constitutional rights to due process of law and a fair trial by the admission of hearsay evidence. Defendant acknowledges that he failed to object to any of the evidence in the trial court and, therefore, couches the issue in terms of ineffective assistance of counsel.

■ "In order to demonstrate ineffective assistance, a defendant must first show counsel's performance was deficient because the representation fell below an objective standard of reasonableness under prevailing professional norms. (*Strickland* v. *Washington* (1984) 466 U.S. 668, 687-688 [104 S.Ct. 2052, 2064-2065, 80 L.Ed.2d 674].) Second, he must show prejudice flowing from counsel's performance or lack thereof. Prejudice is shown when there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. (*In re Avena* (1996) 12 Cal.4th 694, 721 [49 Cal.Rptr.2d 413, 909 P.2d 1017].)" (*People* v. *Williams* (1997) 16 Cal.4th 153, 215 [66 Cal.Rptr.2d 123, 940 P.2d 710].)

■ Where "there was no sound legal basis for objection, counsel's failure to object to the admission of the evidence cannot establish ineffective assistance." (*People* v. *Cudjo* (1993) 6 Cal.4th 585, 616 [25 Cal.Rptr.2d 390, 863 P.2d 635].) And, even when there was a basis for objection, " '[w]hether to object to inadmissible evidence is a tactical decision; because trial counsel's tactical decisions are accorded substantial deference [citations], failure to object seldom establishes counsel's incompetence.' (*People* v. *Hayes* (1990) 52 Cal.3d 577, 621 [276 Cal.Rptr. 874, 802 P.2d 376].) 'In order to prevail on [an ineffective assistance of counsel] claim on direct appeal, the record must affirmatively disclose the lack of a rational tactical purpose for the challenged act or omission.' (*People* v. *Ray* (1996) 13 Cal.4th 313, 349 [52 Cal.Rptr.2d 296, 914 P.2d 846].)" (*People* v. *Williams*, *supra*, 16 Cal.4th at p. 215.)

■ The bulk of the evidence that defendant now claims his trial counsel should have objected to is evidence of Probst's statements to third parties regarding his intent to conduct a drug deal with people from Arizona on the night he was killed. (See, e.g., *ante*, at pp. 396-397 [testimony of Wayne Probst, James Pluskett, Freddie Gregg, Sandra Morgera, and Catherine Bailey].) Since defendant's counsel had posed hearsay objections to the admission of such evidence during the preliminary hearing, the prosecution filed an *in limine* motion arguing that the evidence was admissible. Among other things, the prosecution argued that Probst's statements were admissible as statements of intent to do a future act. (See Evid. Code, § 1250, subd. (a).)[12] At trial, defendant was represented by new counsel, who declined to oppose admission of the evidence, explaining that "from my research it is

---

[12]Evidence Code section 1250, subdivision (a), provides as follows: "Subject to Section 1252, evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when: [¶] (1) The evidence is

my opinion that it comes in under the victim's statement of intent to do something in the future," and noting that he too might "be calling witnesses who also talk about what Mr. Probst said to them on that particular evening about this drug deal."

Trial counsel reasonably concluded that the evidence in question was admissible. Our decision in *People* v. *Alcalde* (1944) 24 Cal.2d 177 [148 P.2d 627] (hereafter *Alcalde*), a decision the Legislature subsequently codified in Evidence Code section 1250 (see *People* v. *Jones* (1996) 13 Cal.4th 535, 548 [54 Cal.Rptr.2d 42, 917 P.2d 1165]), is instructive in this regard. In *Alcalde*, we considered the admissibility of a decedent's statement that she was planning to go out with a man named Frank, the defendant's nickname, on the night she was killed. (*Alcalde*, *supra*, 24 Cal.2d at pp. 187-188.) We held that "[e]lements essential to admissibility are that the declaration must tend to prove the declarant's intention at the time it was made; it must have been made under circumstances which naturally give verity to the utterance; it must be relevant to an issue in the case." (*Id.* at p. 187.) Applying this test, we concluded that the decedent's statement was admissible because "it was a natural utterance made under circumstances which could create no suspicion of untruth in the statement of her intent. . . . Unquestionably the deceased's statement of her intent and the logical inference to be drawn therefrom, namely, that she was with the defendant that night, were relevant to the issue of the guilt of the defendant." (*Id.* at pp. 187-188.)

Throughout his briefing, defendant disparages our decision in *Alcalde*, pointing to both the dissent in *Alcalde* itself as well as subsequent criticism of the decision by legal scholars. In his reply brief, defendant urges that *Alcalde* "is technically wrong" insofar as "it allowed the declarant's statements to be used by the prosecutor to indirectly prove the actions of a person other than the declarant." This argument is misplaced. *Alcalde* has been codified in Evidence Code section 1250 (see *ante*, fn. 12), and, hence, we lack the authority to reconsider it. (See *People* v. *Jones*, *supra*, 13 Cal.4th at p. 548.)

Defendant also attempts to distinguish *Alcalde* on the grounds "Mr. Probst's conduct is not in dispute" because "he didn't go anywhere to meet anyone." That Probst's stated intent was to meet the people from Arizona at his house, rather than somewhere else, does not render his conduct any less

offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain acts or conduct of the declarant." Evidence Code section 1252, in turn, precludes the admission of such a statement if it "was made under circumstances such as to indicate its lack of trustworthiness."

in dispute. Probst's conduct on the night in question, be it his conduct at home or away from home, was one of the central issues in the case. As in *Alcalde*, Probst's statements of his intent and the logical inference to be drawn therefrom, namely, that he met with people from Arizona to conduct a drug deal on the night he was killed, were relevant to the issue of the guilt of defendant. (*Alcalde*, *supra*, 24 Cal.2d at pp. 187-188.) Nor does the fact that Probst's statements did not specifically reference defendant provide a basis for distinguishing *Alcalde*. As in *Alcalde*, there are ample "corroborating circumstances" linking defendant to the planned drug deal. (See *ibid.* [noting other evidence demonstrating that the defendant was the "Frank" referenced in the decedent's statement].)

In addition, defendant maintains that even if Probst's statements were admissible under Evidence Code section 1250, subdivision (a)(2), as statements of intent to do a future act, admission of the statements would nonetheless violate his constitutional right to confront his accuser under the Sixth and Fourteenth Amendments to the United States Constitution. We disagree. Since Probst's statements were relevant to the issue of defendant's guilt and "were properly admitted under the well recognized state-of-mind exception to the hearsay rule, the federal confrontation clause would likewise permit admission of such evidence. [Citations.]" (*People* v. *Morales* (1989) 48 Cal.3d 527, 552 [257 Cal.Rptr. 64, 770 P.2d 244]; see also *People* v. *Cummings* (1993) 4 Cal.4th 1233, 1322 [18 Cal.Rptr.2d 796, 850 P.2d 1].)

Finally, defendant points to a small number of hearsay statements that he claims do not fall within the scope of the state-of-mind exception to the hearsay rule. Some of the evidence, such as Probst's statements identifying the people he was planning to meet as people from Peoria, Arizona, does indeed fall within the scope of the exception. As to the remainder of the evidence, the record fails to establish either prejudice or the lack of a rational tactical purpose for trial counsel's failure to object to the evidence. (*People* v. *Williams*, *supra*, 16 Cal.4th at p. 215.) For example, the evidence elicited from Sean McMillan to the effect that defendant was a moneyman who did not participate in drug deals himself was actually helpful to the defense, which was trying to establish that defendant did not accompany Reese to the Kaula Drive residence.

## 2. *Shackling of Defendant*

Defendant complains that the record fails to disclose an adequate justification for shackling him at trial and, therefore, that the shackling deprived him of due process of law. The facts relevant to this complaint are as follows:

At the outset of the proceedings, defendant's trial counsel noted that although he had not yet had the opportunity to discuss appropriate security measures with defendant, "it seems to me it's in our best interest to have you belly chained in the chair with one officer behind you versus having two or three officers sitting behind you which may have the appearance of something greater than what it is. So just cover it with your sweater, but that's up to you." The trial court explained that if this procedure were employed, "the only way the jury would see is if you tried to stand up and observed the chair come up with you." The next day, defendant confirmed that he had discussed the matter with his counsel and agreed that this was the appropriate procedure.

"It is settled that the use of physical restraints in the trial court cannot be challenged for the first time on appeal. Defendant's failure to object and make a record below waives the claim here. [Citations.]" (*People* v. *Tuilaepa* (1992) 4 Cal.4th 569, 583 [15 Cal.Rptr.2d 382, 842 P.2d 1142].) In this case, not only did defendant fail to object to the security measures taken at trial, he affirmatively consented to them.

Apparently recognizing the waiver problem, defendant argues that his trial counsel was ineffective in suggesting the security measures. The record does not affirmatively disclose the lack of a rational tactical purpose for counsel's actions. (*People* v. *Williams*, *supra*, 16 Cal.4th at p. 215.) Trial counsel's own remarks indicate that he suggested the security measures because they were the least visible means of restraining defendant. Nor is there any basis for assuming, as defendant would have us do, that no justification existed for the physical restraints. To the contrary, as the trial court noted, defendant had a history of escape.

Likewise, the record fails to demonstrate any prejudice flowing from trial counsel's alleged deficiency. (*People* v. *Williams*, *supra*, 16 Cal.4th at p. 215.) Defendant forthrightly acknowledges that the record on appeal fails to establish that any of the jurors actually saw the physical restraints. As for defendant's claim that the restraints prevented him from attending sidebar conferences at which questions from the jury were discussed, defendant himself stated that he did not wish to be present at the conferences, explaining that his trial counsel "knows basically about the way things should go, and any time he has a question, he asks me." Under these circumstances, we cannot assume defendant's absence from the sidebar conferences prejudiced him in any way.

3. *Questions From Jurors*

In the midst of his argument on the issue of shackling, defendant advances a distinct challenge to the procedure by which jurors were allowed to ask

questions of witnesses. During the guilt phase of the trial, the trial court permitted the jurors to submit questions to be asked of witnesses after the attorneys had concluded their questioning. Whenever a question was received from a juror, the trial court and counsel conferred as to whether the question was proper. If so, the party who had called the witness asked the witness the question.

Defendant does not dispute that " '[i]n a proper case there may be a real benefit from allowing jurors to submit questions [to witnesses] under proper control by the court.' " (*People* v. *Anderson* (1990) 52 Cal.3d 453, 481 [276 Cal.Rptr. 356, 801 P.2d 1107].) Defendant asserts, however, that the trial court should have asked the jurors' questions itself rather than allowing the prosecutor to ask the questions. According to defendant, the procedure employed by the trial court "improperly made the district attorney the voice of the jury and provided the prosecution with the unfair advantage of being able to carry the jury's torch." As a preliminary matter, we note the trial court permitted the party who had called a witness to ask the jurors' questions. The fact the prosecutor asked most of the questions reflects nothing more than the fact the prosecution called most of the witnesses. In any event, we have previously approved precisely the procedure employed by the trial court here, specifically rejecting a claim that permitting a party to ask the jurors' questions allowed that party "to 'curry favor' with individual jurors." (*People* v. *Cummings, supra,* 4 Cal.4th at p. 1305.)

### 4. *Instructional Issues*

#### a) *Failure to Give Unanimity Instruction*

Relying on *People* v. *Melendez* (1990) 224 Cal.App.3d 1420 [274 Cal.Rptr. 599], defendant argues that the trial court erred when it failed to instruct the jury that it must unanimously agree he committed the same acts in order to find him guilty of the murder counts and the robbery-murder special-circumstance allegations. (See CALJIC No. 17.01.) Defendant claims that such an instruction was necessary because "[s]ome jurors may have voted to convict on the basis of a belief that Mr. Majors was present at the Kaula Drive residence and personally committed or facilitated the homicides. Other jurors may have voted to convict on the basis of conduct by Mr. Majors prior to Mr. Reese's departure from Denny's. There is no basis for this Court to conclude that the jury ever agreed on what conduct by Mr. Majors made him guilty of capital murder."

At the outset, we note that defendant is simply mistaken when he asserts that there is no basis for this court to conclude the jury ever agreed on the

acts he committed. The jury expressly found defendant had personally used a firearm during the three murders and the robbery. (§ 12022.5, subd. (a).) The jury had previously been instructed that in order to find defendant had personally used a firearm, it had to find he displayed a firearm in a menacing manner, intentionally fired it, or intentionally struck or hit a human being with it. As both the trial court and defense counsel recognized at the hearing on defendant's motion for a new trial, the jury's finding that defendant personally used a firearm is inconsistent with his having remained at the Denny's restaurant while Reese went to the Kaula Drive residence to rob and kill the victims.

In any event, there is no basis for defendant's claim that a unanimity instruction should have been given in this case. "It is settled that as long as each juror is convinced beyond a reasonable doubt that defendant is guilty of murder as that offense is defined by statute, it need not decide unanimously by which theory he is guilty. (*People* v. *Pride* (1992) 3 Cal.4th 195, 249-250 [10 Cal.Rptr.2d 636, 833 P.2d 643]; *People* v. *Milan* (1973) 9 Cal.3d 185, 194-195 [107 Cal.Rptr. 68, 507 P.2d 956].) More specifically, the jury need not decide unanimously whether defendant was guilty as the aider and abettor or as the direct perpetrator. (*People* v. *Beardslee* (1991) 53 Cal.3d 68, 92 [279 Cal.Rptr. 276, 806 P.2d 1311]; *People* v. *Forbes* (1985) 175 Cal.App.3d 807, 816-817 [221 Cal.Rptr. 275].) This rule of state law passes federal constitutional muster. (*Schad* v. *Arizona* (1991) 501 U.S. 624 [115 L.Ed.2d 555, 111 S.Ct. 2491].)" (*People* v. *Santamaria* (1994) 8 Cal.4th 903, 918-919 [35 Cal.Rptr.2d 624, 884 P.2d 81].) To the extent *People* v. *Melendez*, *supra*, 224 Cal.App.3d 1420, suggests to the contrary, it is disapproved.

### b) *Failure to Give Accessory-after-the-fact Instruction*

■ Defendant contends that the trial court had a sua sponte duty to instruct the jury on the crime of accessory after the fact (§ 32) as a lesser *included* offense of murder. Not so. "Murder can be committed without the murderer being an accessory after the fact. The latter offense, therefore, is not necessarily included in the former." (*People* v. *Preston* (1973) 9 Cal.3d 308, 319 [107 Cal.Rptr. 300, 508 P.2d 300]; see also *People* v. *Rodrigues* (1994) 8 Cal.4th 1060, 1157, fn. 57 [36 Cal.Rptr.2d 235, 885 P.2d 1].)

In the alternative, defendant asserts that his trial counsel was ineffective in failing to request an accessory-after-the-fact instruction as a lesser *related* offense of murder. (See *People* v. *Hawkins* (1995) 10 Cal.4th 920, 952 [42 Cal.Rptr.2d 636, 897 P.2d 574] ["[T]he trial court has no sua sponte duty to instruct the jury on lesser related offenses, and defendant's failure to request

the instruction at trial waives the issue on appeal. [Citation.]"].) In this case, however, trial counsel's decision to forgo the instruction was not a result of oversight but rather deference to defendant's own wishes. During the discussion of guilt phase jury instructions, the trial court specifically asked trial counsel to confirm "you were not requesting instruction on P.C. 32 as a lesser-included or reasonably related." Counsel responded, "That's correct. I have discussed it with Mr. Majors. I recommended it to him. His position is he doesn't want it and I'm going to defer to his judgment. I'm not requesting a 32 P.C." Defendant personally acknowledged, "That's absolutely correct. All or nothing." "The invited-error doctrine operates . . . to estop a defendant from claiming ineffective assistance of counsel based on counsel's acts or omissions in conformance with the defendant's own requests."[13] (*People v. Lang* (1989) 49 Cal.3d 991, 1032 [264 Cal.Rptr. 386, 782 P.2d 627], fn. omitted; see also *People v. Frierson* (1985) 39 Cal.3d 803, 817 [218 Cal.Rptr. 73, 705 P.2d 396].)

### c) *Robbery-murder Special-circumstance Instruction*

■ Defendant claims the trial court's instruction on the robbery-murder special circumstance erroneously removed an element of the special circumstance from the jury's consideration, denying him due process of law. He relies on a discrepancy between the oral and written versions of the instruction. The trial court orally instructed the jury as follows: "To find that the special circumstance, referred to in these instructions as murder in the commission of robbery, is true, it must be proved: [¶] 1a) The murder was committed while the defendant was engaged in the commission of a robbery; [¶] 1b) *Or* the murder was committed during the immediate flight after the commission of a robbery by the defendant *or*; [¶] 2) The murder was committed in order to carry out or advance the commission of the crime of robbery or to facilitate the escape therefrom or to avoid detection. In other words, the special circumstance referred to in these instructions is not established if the robbery was merely incidental to the commission of the murder." (Italics added.) The jury was also provided with six written copies of the instructions. The written version omitted the two italicized "or's."

Defendant argues that the addition of the second italicized "or" to the instruction given to the jury orally removed the temporal element described in paragraphs 1(a) and 1(b) from the jury's consideration. In other words, the

---

[13]Defendant makes much of the fact that later, in connection with the new trial motion, his counsel urged that the evidence adduced at trial showed defendant was, at most, an accessory after the fact. Contrary to defendant's assertion, there is nothing inconsistent between counsel's initial decision to defer to defendant's wishes and counsel's subsequent characterization of the state of the evidence after defendant's chosen strategy had proved unsuccessful.

oral instruction allowed the jury to find the special circumstance to be true without finding that "[t]he murder was committed while the defendant was engaged in, or was an accomplice in, the commission of, attempted commission of, or the immediate flight after committing, or attempting to commit" robbery. (§ 190.2, subd. (a)(17)(A).)

We conclude that any error in the oral instruction was harmless. The jury received the correct instruction in written form. (See *People* v. *Crittenden* (1994) 9 Cal.4th 83, 138 [36 Cal.Rptr.2d 474, 885 P.2d 887] [and cases cited therein].) In addition, the prosecutor emphasized the temporal element of the robbery-murder special circumstance during his closing argument, telling the jury that in order to find the special circumstance to be true it "must find that the murder was committed during the course of a robbery." "Rather than exacerbating the trial court's misreading, this argument served to reinforce the correct written version of the instruction." (*People* v. *Crittenden, supra,* 9 Cal.4th at p. 139.) Finally, the verdict form itself reflects the jury's finding that defendant "murdered the victims during the commission of a robbery."

### d) *Instructions on Firearm Enhancements*

■ Defendant asserts that the trial court should have instructed sua sponte on being armed with a firearm (§ 12022, subd. (a)) because it is a "lesser included enhancement" of personally using a firearm (§ 12022.5, subd. (a)). (See *People* v. *Turner* (1983) 145 Cal.App.3d 658, 683-684 [193 Cal.Rptr. 614].) He argues that such an instruction was warranted based on evidence that he remained at the Denny's restaurant while Reese went to the Kaula Drive residence to rob and kill the victims.

Assuming arguendo the evidence supported this theory, an issue we need not decide, we decline defendant's invitation to extend a trial court's sua sponte obligation to instruct on lesser included *offenses* to so-called "lesser included enhancements." One of the primary reasons for requiring instructions on lesser included offenses is " 'to eliminate the distortion of the factfinding process that is created when the jury is forced into an all-or-nothing choice between [guilt] and innocence' "—that is, to eliminate " 'the risk that the jury will convict . . . simply to avoid setting the defendant free.' " (*Schad* v. *Arizona* (1991) 501 U.S. 624, 646-647 [111 S.Ct. 2491, 2505, 115 L.Ed.2d 555].) This risk is wholly absent with respect to enhancements, which a jury does not even consider unless it has already convicted defendant of the underlying substantive offenses. (See generally, *People* v. *Wims* (1995) 10 Cal.4th 293, 307 [41 Cal.Rptr.2d 241, 895 P.2d 77], fn. omitted ["[A] sentence enhancement is not equivalent to a substantive offense, because a defendant is not at risk for punishment under an enhancement allegation until convicted of a related substantive offense. [Citation.]

At that time, a defendant's liberty interest 'has been substantially diminished by a guilty verdict.' [Citation.] The Legislature, moreover, has in various ways expressed its intention that enhancements *not* be treated as substantive offenses."].) Under these circumstances, we hold that a trial court's sua sponte obligation to instruct on lesser included offenses does not encompass an obligation to instruct on "lesser included enhancements." To the extent *People* v. *Turner, supra,* 145 Cal.App.3d at pages 683-684, held to the contrary, it is disapproved.

B. *Penalty Phase Issues*

1. *Failure to Hear Marsden Motion Prior to Penalty Phase*

■ Defendant claims the trial court denied him a fair penalty phase hearing when it "denied/failed to hear" his *Marsden* motion brought between the guilt and penalty phases of the trial. (See *People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44].) The record does not support this claim.

On November 26, 1990, six days after the guilt phase verdicts were returned and before the penalty phase had commenced, defense counsel advised the trial court that defendant planned to make a motion for a new trial based on ineffective assistance of counsel. The trial court rejected defense counsel's suggestion that the best time to address the issue would be after the penalty phase had concluded, unequivocally stating that "[i]f Mr. Majors feels that there are grounds to relieve you of counsel, then it's best that we hear it now, and I'll research what—After I've heard the basis for it." The trial court advised defendant to "decide when you're going to make the motion." Defendant replied that he was "going to need some time then to get everything together—Because I've got a list of 11 things here that I've got to get done, and I'm not even close." Defendant explained that a recent change in his custodial status, which had resulted in the lack of access to materials, telephones and tape recorders, was hampering his ability to pre-pare the motion. The trial court discussed the problem with jail officials, who reinstated defendant's original custodial status.

Defense counsel then relayed defendant's request that the trial court appoint another attorney "to help him determine whether or not there was any inadequate representation. That person could read the transcript, look at the files, and I would be happy to assist that person in any way." The trial court rejected this suggestion, noting "[y]ou can bring to my attention some potential problem; then I would consider that. But at this point in time, I'm not going to hire another lawyer to get involved in the case and expect that

lawyer to jump in with both feet, specifically on a fishing expedition, trying to find something wrong."

Four days later, the parties returned to court to discuss the upcoming penalty phase. At the conclusion of the day's proceedings, the trial court inquired whether there was anything else to discuss concerning "the previous motions about relieving counsel." Defense counsel responded that he and defendant were in agreement that any motion for a new trial based on ineffective assistance of counsel should be made at the conclusion of the penalty phase after defendant had had an opportunity to review his documents. Defendant expressly agreed, stating "[u]nless something else turns up, that's true." The trial court subsequently assured defendant that it would not treat such a motion any differently if made later rather than sooner.

On January 18, 1991, about a month after the penalty phase verdict was returned, defendant filed a 47-page motion for a new trial, with new counsel, based on the ineffective assistance of his trial counsel. Shortly thereafter, the trial court conducted an exhaustive in camera hearing, at which defendant fully aired his complaints and defense counsel responded point by point. (See *People* v. *Smith* (1993) 6 Cal.4th 684, 696 [25 Cal.Rptr.2d 122, 863 P.2d 192].) At the conclusion of the hearing, the trial court denied the motion.[14]

On this record, there is no basis for defendant's claim that the trial court should have heard his *Marsden* motion prior to the penalty phase for the simple reason that the motion had not yet been made. To the contrary, defendant personally stated that he was "going to need some time then to get everything together" and was "not even close" to being ready to make the motion. Defendant later confirmed that he wanted to wait until after the penalty phase to make the motion so long as it would not impair his substantive right to a new trial based on the ineffectiveness of his trial counsel.

"The mere fact that there appears to be a difference of opinion between a defendant and his attorney over trial tactics does not place a court under a duty to hold a *Marsden* hearing." (*People* v. *Lucky* (1988) 45 Cal.3d 259, 281 [247 Cal.Rptr. 1, 753 P.2d 1052].) Rather, "a trial court's duty to permit a defendant to state his reasons for dissatisfaction with his attorney arises [only] when the defendant in some manner moves to discharge his current counsel." (*Ibid.*, fn. omitted.) In this case, the trial court conducted a

---

[14]The prosecutor agreed that this hearing could be conducted outside his presence provided that any potentially meritorious issues in the new trial portion of the motion were reargued in his presence. (See *People* v. *Smith, supra,* 6 Cal.4th at p. 694, fn. 2.)

thorough and comprehensive hearing on defendant's motion as soon as it was made. No error occurred.

2. *Defendant's Absence From Penalty Phase Proceedings*

■ Defendant maintains that the trial court violated his statutory and constitutional rights by granting his request to be absent from the penalty phase of the trial. We begin our analysis of this issue with a review of the pertinent facts.

Shortly after the guilt phase verdicts were returned, during an in camera hearing, defense counsel advised the trial court that defendant "may want to waive his appearance for the penalty phase, and he wanted me to advise the Court that he just doesn't want to act out. He's just afraid that he's going to get too upset." Defendant confirmed, "I really don't know if I can sit here and listen to [the prosecutor] call me three kinds of assholes and whatever else he's going to do, because I know he's going to. And I don't really know if I can handle it."

Before the penalty phase commenced, the trial court held a hearing on the issue. The trial court began by announcing its view that "[section] 977 specifically does not allow a defendant to excuse himself during evidentiary proceedings."[15] The trial court then explained that, notwithstanding the statutory language, it might be willing to permit defendant's absence, but only if it were convinced he was likely to disrupt the proceedings.

Outside the presence of the prosecutor, defendant expressed concerns about the planned testimony of his parents at the penalty phase. He was afraid that if the prosecutor aggressively cross-examined his mother, "I will probably say something that I shouldn't. And I don't want to be here. I don't." Defendant was aware of the possible ramifications of not being

---

[15]Section 977, subdivision (b)(1), provides as follows: "In all cases in which a felony is charged, the accused shall be present at the arraignment, at the time of plea, during the preliminary hearing, during those portions of the trial when evidence is taken before the trier of fact, and at the time of the imposition of sentence. The accused shall be personally present at all other proceedings unless he or she shall, with leave of court, execute in open court, a written waiver of his or her right to be personally present . . . ."

Similarly, section 1043 provides as follows: "(a) Except as otherwise provided in this section, the defendant in a felony case shall be personally present at the trial. [¶] (b) The absence of the defendant in a felony case after the trial has commenced in his presence shall not prevent continuing the trial to, and including, the return of the verdict in any of the following cases: [¶] (1) Any case in which the defendant, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that the trial cannot be carried on with him in the courtroom. [¶] (2) Any prosecution for an offense which is not punishable by death in which the defendant is voluntarily absent."

present, including the inability to help his counsel with the cross-examination of prosecution witnesses. The trial court responded that it "would not excuse Mr. Majors just on the basis that you think it's a waste of time, you're disgusted, you're depressed, those things; I specifically would order you to remain here. [¶] However, I respect your evaluation of yourself and your emotions in the situation, and you tell me that there is a strong possibility that you would act out, get angry and beat on the table or stand up and call somebody an asshole, do something of that nature that would disrupt the proceedings and perhaps make an impact on the jury that would be detrimental to you, then I would excuse you for that reason and for that reason only." Defendant replied, "I would definitely give you that—I would do that. I believe I would." The trial court then posed the following direct question to defendant: "[Do] [y]ou feel that [there] is a strong possibility or probability that you would be unable to control your emotions and that you would physically or verbally act out in that type of fashion?" Defendant's response: "Yes." Defendant went on to explain, "I don't think I would hit anybody, anything like that. But I would probably say a lot of things that I don't want to say, because I told you before, that's why I brought it to your attention before. I don't want to do that. I really don't. [¶] And, you know, I think the jury has already made up their mind. I don't think this is going to change their minds in any way. And I don't want to be here to watch it. Because I know I'll go off. I know I will." Following this explanation, the trial court agreed to permit defendant's absence from the penalty phase, reasoning "that's the critical point, the last few words. You certainly don't want to be here to watch it because you're disgusted with it. That's certainly one thing, but if you feel there's a strong risk that you're going to act out, then I think it's best to comply with your wishes."

Back in the presence of the prosecutor, the trial court secured an oral waiver from defendant, specifically cautioning defendant as to the many pitfalls of being absent from the penalty phase. The trial court reiterated, and defendant acknowledged, that "the only reason I would excuse you is your representation that you may not be able to control your emotions during certain portions of this proceeding and that you may physically or orally act out, and that that may have a detrimental impact on your case." At the beginning of the penalty phase proceedings, the trial court admonished the jury not to draw any inferences from defendant's absence.

Defendant now asserts that the express terms of sections 977 and 1043 (see *ante*, fn. 15) prohibited him from waiving his presence during the penalty phase or, in the alternative, that a written waiver was required. "[W]hen read together, sections 977 and 1043 permit a capital defendant to be absent from the courtroom only on two occasions: (1) when he has been

removed by the court for disruptive behavior under section 1043, subdivision (b)(1), and (2) when he voluntarily waives his rights pursuant to section 977, subdivision (b)(1). However, section 977, subdivision (b)(1), the subdivision that authorizes waiver for felony defendants, expressly provides for situations in which the defendant cannot waive his right to be present, including during the taking of evidence before the trier of fact. Section 1043, subdivision (b)(2), further makes clear that its broad 'voluntary' exception to the requirement that felony defendants be present at trial does not apply to capital defendants." (*People* v. *Jackson* (1996) 13 Cal.4th 1164, 1210 [56 Cal.Rptr.2d 49, 920 P.2d 1254].)

As noted, under the governing statutory scheme, a trial court retains the discretion to remove a capital defendant who "has been disruptive or threatens to be disruptive. . . . The trial court's ability to remove a disruptive or potentially disruptive defendant follows not only from section 1043, subdivision (b)(1), but also from the trial court's inherent power to establish order in its courtroom. (See Code Civ. Proc., § 1209 [trial court has the power to sanction various acts of contempt of court].)" (*People* v. *Jackson, supra*, 13 Cal.4th at p. 1211.)

Here, the trial court did not permit defendant to "waive" his presence in the sense of voluntarily absenting himself from the courtroom. Rather, it is abundantly clear from the trial court's remarks that the only reason it permitted defendant to be absent was that it accepted his representations that he was likely to be disruptive. We generally defer to a trial court's determination as to when disruption from a defendant may be reasonably anticipated. (*People* v. *Jackson, supra*, 13 Cal.4th at p. 1211.) Such deference is particularly warranted where, as here, the likelihood of disruption turns on the credibility of a defendant's own representations to the trial court. Since the trial court's ruling was based on a credible threat of disruption, defendant's focus on the form of his "waiver" is equally misplaced.

Defendant also claims that the trial court violated his rights under the state and federal Constitutions when it authorized his absence during the penalty phase. He is mistaken. Defendant relinquished his constitutional right to be present, both by requesting to be absent and by threatening to be disruptive. (*People* v. *Jackson, supra*, 13 Cal.4th at p. 1210; *People* v. *Medina* (1995) 11 Cal.4th 694, 738 [47 Cal.Rptr.2d 165, 906 P.2d 2]; *People* v. *Price* (1991) 1 Cal.4th 324, 405 [3 Cal.Rptr.2d 106, 821 P.2d 610]; *People* v. *Sully* (1991) 53 Cal.3d 1195, 1239 [283 Cal.Rptr. 144, 812 P.2d 163].)

3. *Refusal to Allow Jury to View Life-Without-Parole Prison Cell*

During its penalty phase deliberations, the jury requested "to view a life without parole cell and environment with the normal people who live

there." The trial court responded, "that just can't be done." Defendant maintains that the trial court's ruling was erroneous because it deprived the jury of relevant evidence constituting a mitigating circumstance.

The trial court's ruling was correct. The requested information was not a mitigating circumstance because "[i]t went neither to defendant and his background nor to the nature and circumstances of his crime." (*People* v. *Thompson* (1988) 45 Cal.3d 86, 139 [246 Cal.Rptr. 245, 753 P.2d 37]; see also *People* v. *Quartermain* (1997) 16 Cal.4th 600, 632 [66 Cal.Rptr.2d 609, 941 P.2d 788]; *People* v. *Daniels* (1991) 52 Cal.3d 815, 877-878 [277 Cal.Rptr. 122, 802 P.2d 906].) Moreover, "[d]escribing future conditions of confinement for a person serving life without possibility of parole involves speculation as to what future officials in another branch of government will or will not do. [Citation.]" (*People* v. *Thompson, supra,* 45 Cal.3d at p. 139.) Although defendant argues that "this logic is incorrect and the matter should be revisited, at least as to the question of the admissibility of evidence about how a life without parole prisoner would live," he advances no persuasive reason as to why this is so. Since the evidence was inadmissible, defendant's claim that his trial counsel was ineffective in failing "to present the requested information in any other form or to present any evidence of a similar nature" also fails.[16]

### 4. *Denial of Automatic Motion for Modification of Penalty Verdict*

Defendant contends that the trial court failed to give an adequate statement of its reasons for denying his automatic motion for modification of the jury's penalty verdict.[17] (See § 190.4, subd. (e).) This contention is meritless.

At the outset of the hearing on the motion, the trial court made it clear that it was independently weighing the penalty evidence. The trial court proceeded to identify the following aggravating factors: "the brutality involved in these killings, and it is with all three killings, was—I am having difficulty even finding words to describe it. But the brutal way these three lives were taken is unusual even in this violent day and age. [¶] The fact that there were three killings, the fact that Mr. Majors has shown no remorse at all, of course

[16]In any event, the premise underlying defendant's ineffectiveness claim is mistaken. At defense counsel's request, the trial court admitted a photograph of a prison cell along with a stipulation that it depicted a typical five-foot by eight-foot cell occupied by a prisoner serving a sentence of life without the possibility of parole. Defense counsel used the photograph to defendant's advantage during his penalty phase closing argument.

[17]Defendant also states generally that the trial court "improperly denied" the motion. However, he advances no specific claim of error apart from his claim that the trial court's statement of reasons was inadequate.

that is consistent with maintaining his innocence. But a significant factor in this case, in addition to the facts of this particular murder, were the two prior incidents that Mr. Majors was involved in were particularly shocking, as his conduct regarding the individual he placed in the trunk of the car and then apparently tracked that person down with the intent of killing him. It just shows a mind that has absolutely no regard for human life."[18] The trial court went on to find these aggravating factors "more than justify the death penalty in this case," observing that the mitigating evidence was "not a significant factor" because it reflected "little more than what the average person or what many people suffer throughout their life times." This statement of reasons was more than adequate. (See *People* v. *Montiel* (1993) 5 Cal.4th 877, 946 [21 Cal.Rptr.2d 705, 855 P.2d 1277]; *People* v. *Anderson, supra,* 52 Cal.3d at p. 484.)

## C. *Juror Misconduct Issues*

Defendant asserts that he was denied his statutory and constitutional rights to a fair trial by several instances of juror misconduct. ▋ "As a general rule, juror misconduct 'raises a presumption of prejudice that may be rebutted by proof that no prejudice actually resulted.' [Citations.]" (*In re Hitchings* (1993) 6 Cal.4th 97, 118 [24 Cal.Rptr.2d 74, 860 P.2d 466].) In determining whether misconduct occurred, "[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence. [Citations.] Whether prejudice arose from juror misconduct, however, is a mixed question of law and fact subject to an appellate court's independent determination. [Citations.]" (*People* v. *Nesler* (1997) 16 Cal.4th 561, 582 [66 Cal.Rptr.2d 454, 941 P.2d 87] (lead opn. of George, C. J.).) With these principles in mind, we turn to the specific claims of juror misconduct advanced by defendant.

### 1. *Juror Concealment Claim*

▋ Defendant's first misconduct claim is one of juror concealment. He alleges that the jury foreperson, Rring Mohr, concealed facts during voir dire that would have revealed a potential for bias. It is well established that "[a] juror who conceals relevant facts or gives false answers during the voir dire examination thus undermines the jury selection process and commits misconduct. [Citations.]" (*In re Hitchings, supra,* 6 Cal.4th at p. 111.) In this

[18]During the penalty phase of the trial, Ronald Hayes testified as to a 1976 incident in which defendant had robbed him at gunpoint and ordered him to drive to a remote location, where defendant abandoned him locked in the trunk of his car. About three weeks later, defendant forced his way into Hayes's apartment at gunpoint and directed him to lie face-down on the floor. Rather than comply, Hayes took a swing at defendant, who shot him in the left shoulder and ran out of the apartment.

case, however, defendant has failed to establish the factual predicate of his juror concealment claim—namely, that Mohr concealed relevant facts or gave false answers during voir dire.

The juror concealment claim was one of several grounds for defendant's motion for a new trial. In the motion, defendant focused on three questions and answers contained in Mohr's jury questionnaire.[19] Question No. 13 asked, "Are you or any close friend or relative associated with any federal, state or local law enforcement agency or other governmental office such as Sacramento Sheriff's Department, district attorney, or judges, or the Department of Corrections?" Mohr responded "no" to this question. Question No. 16 asked, "Have you or any close friend or relative ever been involved in a criminal case or assaultive crime either as a victim, defendant or witness[?]" Mohr recounted an incident in which a drunk driver had run into his sister's house. Question No. 51A asked, "Do you know anyone whom you believe to be a drug user or seller[?]" Mohr responded "no" to this question.

Defendant's juror concealment claim was based largely on statements Mohr made to David Deragisch, a defense investigator. After Mohr confirmed that statements he made to Deragisch during two posttrial interviews were truthful, the trial court accepted transcripts of the interviews as affidavits.[20] During the interviews, Mohr stated that his wife had dealt cocaine when she was a teenager. Mohr did not know her at the time. Mohr also indicated that after the trial he had "talked to my buddies who are [prison] guards" about the treatment defendant would receive on death row. At one point, Mohr referred to these individuals as "friends," later explaining, "I call everybody my friend" and that they were really more of "acquaintances." In addition, Mohr described an incident in which his sister's husband's brother, who had previously been a correctional officer, had been slashed by an inmate. Mohr referred to this individual as a "cousin," explaining, "I call everybody my cousin."

At the hearing on the new trial motion, the trial court heard additional live testimony from Mohr. In explaining his answer to question No. 13, Mohr testified, "I don't consider the people that I know that work for the Department of Corrections close friends or relatives. So I answered that truthfully. [¶] However though, I have a lot of people that I call my cousins who are not my cousins. And so I had to break this down are they really a relative, are

---

[19]Although the jury questionnaires were not made a part of the record on appeal, the pertinent questions and answers were read into the record at the hearing on the new trial motion.

[20]Although there were two transcribed interviews, at the hearing on the new trial motion the parties and the trial court referred to them as though they were a single interview.

they really a close friend and the answer was no. So I answered truthfully." Mohr answered "no" to question No. 51A because "I didn't know anybody at the time, friend or anybody that either sold drugs or used drugs." In other words, he understood the question to be directed to present use or sales only.

At the conclusion of the hearing on the new trial motion, the trial court denied the motion in its entirety. The trial court did not specifically comment on its reasons for denying the juror concealment claim. On appeal, defendant does not challenge the veracity of the statements made by Mohr. To the contrary, he argues that the statements themselves demonstrate that Mohr intentionally concealed information that would have revealed a potential for bias. We address each instance of alleged concealment in turn.

First, defendant argues that since question No. 13 mentioned the Department of Corrections, Mohr should have identified his "buddies who were correctional officers." This argument overlooks Mohr's uncontradicted testimony that although he sometimes referred to these individuals as "buddies" or "friends," he considered them "acquaintances" rather than "close friends." Defendant made no attempt to challenge this testimony by probing the nature and extent of Mohr's relationships with the individuals. Under these circumstances, defendant has not established that Mohr failed to identify "close friend[s]" who were correctional officers, the information called for in question No. 13. (See *People* v. *Duran* (1996) 50 Cal.App.4th 103, 114-115 [57 Cal.Rptr.2d 635] [no juror concealment and, hence, no misconduct absent showing juror had "close relationship" with individual the juror failed to identify in voir dire].)

Second, defendant contends that Mohr should have identified his "correctional officer relative" in response to question No. 13 and question No. 16. Once again, defendant overlooks Mohr's uncontradicted testimony that he used the term "cousin" loosely and did not consider his sister's husband's brother to be a "close friend[] or relative[]." And, once again, defendant made no attempt to challenge Mohr's testimony in this regard. Given the distant nature of the familial bond between Mohr and his sister's husband's brother, we have no basis for questioning his characterization of their relationship. In short, defendant has not established that Mohr failed to identify a "close friend or relative" who was a correctional officer, the information called for in question No. 13, or a "close friend or relative" who had been assaulted, the information called for in question No. 16.

Finally, defendant maintains that Mohr should have identified his wife in response to question No. 51A. Defendant characterizes Mohr's response as "simplistic and hypertechnical." We disagree. Mohr's wife's drug sales

occurred when she was a teenager, before Mohr even knew her. More importantly, question No. 51A was clearly phrased in the present tense. We cannot fault Mohr's decision to respond to the question as phrased.

In the alternative, in his reply brief, defendant asserts that his trial counsel was ineffective in failing to draft the jury questionnaire in a manner that would have elicited the information described above.[21] Defendant has failed to demonstrate that his trial counsel's performance was deficient. As a preliminary matter, defendant has not shown that it was his trial counsel who was responsible for the limiting language used in the jury questionnaire. Although his trial counsel drafted the questionnaire, the trial court stated that it had made some modifications to it. The nature of these modifications is not apparent in the record. Assuming arguendo it was defendant's trial counsel who was responsible for the wording, there is still no basis for a claim of deficient performance. Of necessity, not every aspect of every potential juror's background can be explored during voir dire. Trial counsel's decision to focus on *present* drug use or sales and on *close* friends or relatives fell well within an objective standard of reasonableness under prevailing professional norms. (*People* v. *Williams*, *supra*, 16 Cal.4th at p. 215; see also *People* v. *Kelly* (1992) 1 Cal.4th 495, 517 [3 Cal.Rptr.2d 677, 822 P.2d 385] [examples of topics routinely addressed during voir dire].)

### 2. *Comment on Lack of Executions in California*

Defendant's second misconduct claim is based on a comment that Mohr allegedly made during the penalty phase deliberations regarding the lack of executions in California. Among other things, defendant contends that the comment misled the jury into believing that responsibility for determining the appropriateness of a death sentence rested elsewhere, denied him the opportunity to rebut evidence favoring a death sentence, undermined the reliability of the death sentence, constituted improper receipt of evidence outside the courtroom, violated the duty to disclose knowledge regarding facts in controversy, and deprived the jury of accurate and complete information. We conclude that the comment, if made, was not misconduct and that, even if it were, the presumption of prejudice arising therefrom has been rebutted.

Like the juror concealment claim, this misconduct claim was also raised in defendant's motion for a new trial. In the motion, defendant relied primarily

---

[21]This case was tried shortly after the passage of Proposition 115. At the outset of trial, the trial court noted that it was not yet clear whether the provisions of Proposition 115 applied retroactively. Accordingly, the trial court declined to apply its restrictions on voir dire. Subsequently, this court held that the voir dire restrictions of Proposition 115 were, in fact, retroactive. (See *Tapia* v. *Superior Court* (1991) 53 Cal.3d 282, 299-300 [279 Cal.Rptr. 592, 807 P.2d 434].)

on the declaration of Peggy Cecil, a law clerk to his trial counsel. In the declaration, Cecil asserts that immediately following the penalty phase of the trial she commented on the speed with which the jury had reached its verdict. According to Cecil, Mohr replied "that while he and some other jurors were in favor of imposing the death sentence, some of the other jurors were leaning toward life without parole. MR. MOHR stated that he explained to them that it was general knowledge that nobody sentenced to death was actually executed in California. I believe MR. MOHR said nobody within the past 15 years."

Defendant's reliance on the Cecil declaration is somewhat problematic. In its written opposition to defendant's new trial motion, the prosecution moved to strike the declaration on the grounds it was hearsay. At the outset of the hearing on the new trial motion, the trial court seemed to agree, stating "I had read the declaration[], and obviously the declaration of Peggy Cecil . . . [is] obviously hearsay. And I had not intended to." Later, however, the prosecutor stated that since the trial court had already read the declaration he had no objection to the trial court considering it "in the total calculus of whatever Mr. Mohr . . . has to say today." Indeed, during his argument to the trial court, the prosecutor acknowledged that Mohr had made a comment to the effect that "[i]t takes a long time to execute people in California and nobody's been executed." Ultimately, the trial court seems to have accepted the premise that Mohr had made such a comment, ruling as follows: "I'm not pleased to find out that jurors, particularly the foreperson, even mentioned whether or not the death penalty is imposed or would be imposed . . . . [¶] However, I'm satisfied with Mr. Mohr's testimony that this was just a passing comment and that the jurors focused on the law and reminded each other that they had to follow the law as dictated by the Court. And with that I cannot see how this could possibly have affected or influenced the verdict."

For the purposes of our analysis, we shall assume, without deciding, that Mohr made the comment in question. Our decision in *People* v. *Cox* (1991) 53 Cal.3d 618 [280 Cal.Rptr. 692, 809 P.2d 351] is particularly instructive. In *Cox*, one of the jurors told the entire panel that no one in California had been executed since the 1960's and referred to former Chief Justice Rose Bird. (*Id.* at pp. 693, 696.) We rejected defendant's misconduct claim, holding that the comment came within "the ambit of 'knowledge and beliefs about general matters of law and fact that find their source in everyday life and experience,' which jurors necessarily bring to their deliberations because our jury system is 'fundamentally human.' [Citation.] [¶] At the time the jury was considering defendant's penalty, February 1986, Chief Justice Bird and Associate Justices Grodin and Reynoso were the objects of a strenuous and well publicized campaign to unseat them at the impending retention election.

It coalesced around the high percentage of death penalty reversals and the claim that, led by the Chief Justice, this court was intentionally evading the law in refusing to affirm more of those decisions and allow executions to recommence. Regardless of their political interest or inclination, few citizens of the state could have been unaware of the situation or the circumstances prompting these efforts. [Citation.] We find no misconduct in a single reference to factual matters of which the entire jury undoubtedly had some independent knowledge." (*Id.* at p. 696.)

Defendant attempts to distinguish *Cox* on the grounds it "was tried during a time when several members of the California Supreme Court were being challenged politically because of their rulings on death penalty cases. [Citation.] The question of whether people were going to be executed was squarely in front of the public on a day to day basis. No such situation existed in the Fall of 1990 when the present case was tried." We are not persuaded by this attempt to distinguish *Cox*. Although the retention election was over by the time this case was tried, there had still not been an execution in California since 1967, and the question of when, and if, anyone would be executed was still very much a matter of public debate.

In any event, the trial court specifically found that Mohr's remark was "just a passing comment and that the jurors . . . reminded each other that they had to follow the law as dictated by the Court." This finding is supported by substantial evidence,[22] and, hence, we accept it here. (*People* v. *Nesler*, *supra*, 16 Cal.4th at p. 582 (lead opn. of George, C. J.).) Under these circumstances, even if we were to deem the comment to have been misconduct, we would readily conclude that the presumption of prejudice arising therefrom had been rebutted.

### 3. *Discussions by Jurors Prior to Deliberations*

■ Defendant's third misconduct claim is premised on his assertion that some jurors, separated from the rest of the jurors, discussed the trial and expressed opinions while the trial was in progress. "The Penal Code provides that jurors must not 'converse among themselves or with anyone else on any subject connected with the trial, or . . . form or express any opinion thereon until the cause is finally submitted to them.' ([Former] § 1122[, now

---

[22]At the hearing on the new trial motion, Mohr testified that although jurors occasionally shared their opinions on matters that "like my opinion, had nothing to really do with anything," they reminded each other "that's just your opinion" and returned to the facts and the trial court's instructions.

§ 1122, subd. (b)].) [Defendant's] jury was so instructed.[23] Violation of this duty is serious misconduct. [Citation.]" (*In re Hitchings, supra,* 6 Cal.4th at p. 118, original fn. omitted.) Defendant has failed to establish that such misconduct occurred in the present case.

Defendant raised this misconduct claim as another of the grounds for his motion for a new trial. At the hearing on the motion, the trial court heard testimony from three jurors, Foreperson Mohr and Jurors Michael Miller and Herbert Swafford.

While he was being interviewed by defense investigator Deragisch,[24] Mohr was asked to confirm that "there was never any discussion that you can remember about the case" outside the courtroom. Mohr replied, "Other than stuff that wouldn't apply to it, you know as far as talking about it to the other jurors, I sometimes say gees, you know, I am glad I don't know this person. Or [i]f I were accused, I hope you know, I have a good lawyer or something. I mean we kept that right inside the courtroom and that is about it."

At the outset of his testimony, Miller categorically denied that he had heard or participated in conversations regarding the evidence in the case during the course of the trial. However, he went on to state that "[m]aybe on two or three occasions" he had heard other jurors briefly talk about the case. He explained that "[t]hough, I may have heard some things I really blotted it out." Then, Miller testified that the evidence in the case "did come up sometimes" during conversations with Swafford; he estimated that these conversations occurred once or twice a week for a total of six to eight times during the trial. Miller proceeded to equivocate, stating "[o]ur discussion was not about the trial. It came up here and there. My conversation, I was discussing other things. We have other things that we talked about other than the trial."

Miller went on to testify that "I heard opinions but they were not my opinions, and I gave that indication to the person that I was speaking of that I respected whatever your opinion is but I have my own opinion. I didn't want to hear it and the conversation changed." When defense counsel asked

[23]At the outset of the trial, the jurors were admonished as follows: "[Y]ou must not converse among yourselves nor with any other person on any subject connected with this case or this trial. If anyone should try to talk to you about this case or this trial, please let me know immediately. [¶] Also, you must not form or express any opinion upon any matter involved in this case until the entire case is finally submitted to you." The parties then stipulated "that at any recess or adjournment it will be legally sufficient if the Court reminds the jurors of this admonition without repeating it in full[.]"

[24]As noted above, the trial court accepted transcripts of the interviews as affidavits.

whether Swafford had told him "that he had formed the opinion that Mr. Majors was guilty and that [the prosecutor] was loosing [*sic*] the case," Miller replied, "He expressed an opinion somewhat like that." According to Miller, this occurred in "the early phase of the trial. But he was not the only one that expressed that opinion. It was speculation. [¶] . . . [¶] And opinions were changed through the course of the weeks to different—it was like, I guess depends on them going back and forth." Miller continued, " I would say at different times I've heard groups of three, two, give their opinions on the case, at least six or seven give their opinions." When asked whether "any of them [were] already convinced of Mr. Majors' guilt," Miller responded, "I really don't recall. They just varied. Some were not sure, some were speculating. It was all speculation."

Swafford denied discussing the evidence with Miller or any of the other jurors prior to deliberations. Although he talked with Miller and Mohr "about a lot of things," they "did not discuss this case." Swafford explained that he had "asked Mr. Miller and Mr. Mohr if I say something while we're talking that pertains to what went on in that courtroom, stop me. And they did a good job." When asked whether he had expressed an opinion during the course of the trial that defendant was guilty and that the prosecutor was losing the case, Swafford replied, "I said it in the deliberating box" after the case had been submitted to the jury.

At the conclusion of the hearing on the new trial motion, the trial court ruled as follows: "I'm satisfied that any discussions that Mr. Miller and Mr. Swafford had were not focusing on the evidence of the case or the outcome of the case but more so [on] the process and perhaps the frustration of being a black person in what Mr. Miller may consider a white process.[25] And I can understand stand [*sic*]—I am satisfied that could not reasonably have affected the outcome of the trial."[26]

As noted above, in determining whether misconduct occurred, "[w]e accept the trial court's credibility determinations and findings on questions

---

[25]During the hearing on the new trial motion, the trial court declined defense counsel's invitation to accept a transcript of a posttrial interview of Swafford by defense investigator Deragisch as an affidavit because Swafford testified that the transcript was inaccurate. Nonetheless, at defense counsel's urging, the trial court reviewed a few pages of the transcript. In these portions of the transcript, Swafford recounted a conversation with Miller in which they discussed what it was like to be a Black person in a predominantly White society.

[26]Prior to sentencing, the trial court called Mohr back to court to clarify a few points. While Mohr was testifying, defendant personally asked him to comment on Miller's testimony "that during the trial that you and he and Mr. Swafford had discussions at least two or three times per week about the case." Mohr responded, "We had discussions. They weren't always concerning the case, but we had a lot of discussions, a ton of discussions, yeah. [¶] As far as the details of the case, I had to keep a lid on Mr. Swafford. If you know Mr. Swafford like I got [to] know him, he likes to talk. He likes to ramble on. And he knew that he likes to talk

of historical fact if supported by substantial evidence. [Citations.]" (*People v. Nesler, supra*, 16 Cal.4th at p. 582 (lead opn. of George, C. J.).) In this case, the record at the hearing on the new trial motion provides ample support for the trial court's finding that "any discussions that Mr. Miller and Mr. Swafford had were not focusing on the evidence of the case or the outcome of the case." Both Swafford and Mohr testified that the discussions did not relate to the evidence in the case. Miller's testimony was vague and contradictory, at some points suggesting that the discussions related to the evidence and at other points stating "[o]ur discussion was not about the trial." Even when defense counsel asked a highly leading question about whether Swafford had expressed a particular opinion, Miller could only reply that the opinion was "somewhat like that."

The trial court made no specific findings as to jurors other than Miller and Swafford. The evidence as to these jurors, however, is even more equivocal. Although Miller testified that he heard them expressing opinions, he could not recall what these opinions were, repeatedly referring to them as "specu-lation." Absent concrete evidence as to the content of the jurors' discussions or the nature of their opinions, the record fails to establish misconduct. As this court observed a century ago, "[t]he law does not demand that the jury sit with the muteness of the Sph[i]nx, and when jurors are observed to be talking among themselves it will not be presumed that the act involves impropriety, but in order to predicate misconduct of the fact it must be made to appear that the conversation had improper reference to the evidence, or the merits of the case." (*People v. Kramer* (1897) 117 Cal. 647, 649 [49 P. 842].)

### 4. *Receipt of Outside Information*

■ Defendant's last two misconduct claims relate to the jurors' alleged receipt of outside information regarding several killings in Arizona. Facts relating to these killings were recounted in two newspaper articles published during the course of the trial. The first article, published near the beginning of the trial, reported that Reese had been found shot to death in an Arizona desert a month after his trip to Sacramento with defendant. The second article, published near the end of the trial, repeated this information and also reported that bullets recovered from the Kaula Drive crime scene had been linked to a string of seven homicides in Arizona.

The parties and the trial court took a number of steps to shield the jury from information regarding these killings. The prosecutor instructed wit-nesses not to mention the Arizona homicides or Reese's death. At the outset

---

a lot, so he told Mr. Miller and especially me and Mr. Miller that if he started to get out of line that we jump on him and stop him." Mohr twice denied that any of their discussions had been "about the evidence of the case."

of the trial, the trial court admonished the jurors to avoid exposure to all media coverage regarding the case. Later, when one of the jurors asked a question about the whereabouts of Reese,[27] the trial court gave the entire jury the following instruction: "there has been evidence in this case indicating that a person other than defendant was or may have been involved in the crime for which the defendant is on trial. [¶] Do not discuss or give any consideration to why the other person is not being prosecuted in this trial or whether or not he has been or will be prosecuted. In other words, there are legal reasons why you won't hear any more about Mr. Reese." The trial court repeated this admonition during both the penalty and guilt phase jury instructions, and both the prosecutor and defense counsel emphasized the instruction during their closing arguments.

Notwithstanding these efforts, defendant asserts the jurors did, in fact, receive information regarding the killings in Arizona. He premises two claims of misconduct on this assertion. We now turn to these claims.

a) *Juror Mark Powers*

Shortly after the trial court gave its initial admonition regarding Reese, Juror Mark Powers approached the trial court and said that he had been exposed to something about the case. At a hearing outside the presence of the rest of the jury, Powers explained that "[o]n my way home, or way back to work on Monday, I stopped at a sandwich shop on J Street and was standing in line and not paying much attention to anything. But I overheard a statement that somebody had made behind me, a man that said, 'No, no. Reese was killed in Arizona.' [¶] And so I immediately, you know, got out of line and walked out the door, didn't, you know, look to see who it was or anything else. And then [I] just went back to work." The references to "Reese" and "Arizona" had caught Powers's attention.

Powers assured counsel and the trial court that he would not share what he had heard with other jurors or allow it to enter into his deliberations in any way. The trial court then conducted the following inquiry:

"THE COURT: From that statement, did you make any conclusions about why he was killed or when or—Do you have any thoughts about that at all?

"JUROR POWERS: Well, I've tried to separate that and not think about it anymore. But, you know, the natural thought that keeps coming to mind is:

---

[27]This question was asked at the conclusion of the testimony of Michelle Blouir, Reese's former girlfriend. During the hearing on defendant's motion for a new trial, Juror Swafford explained that Blouir's testimony had made him think Reese might be dead because she referred to him in the past tense. Swafford asked about Reese's whereabouts because he "wanted to know where Robert Reese was because Robert Reese's name was mentioned many many times over the period of this trial."

Well, who would have reason to make sure that he didn't, you know, live? And that would be, you know, obvious—Obviously Mr. Majors. But I— [¶] I would probably not give any credence to that natural assumption or anything else or—Because he's obviously a drug dealer; it could have been a multiple thing. And it was just the time and the number of years that have passed obviously since that; there was no indication of when that happened or what. [¶] So, no, honestly, that was an assumption that I tried to put that out of my mind and say, well, there's a possibility that it could have been. And just because that's one didn't mean that—That's the one that is the truth.

"THE COURT: Okay. I think—Well, then, you do recognize that there's many, many possibilities as to how or whether that was an accident or—Whatever?

"JUROR POWERS: Yeah. I thought he could have died in a car wreck, a plane crash. There's a number of ways that he could have—An overdose, whatever.

"THE COURT: The thing you heard was, he was killed in Arizona?

"JUROR POWERS: Right.

"THE COURT: Not that he was murdered or anything else?

"JUROR POWERS: No."

After conferring with defendant, defense counsel declined to challenge Powers. Defense counsel explained, "I have discussed whether or not to challenge Mr. Powers with Mr. Majors. There is some concern that has been expressed by Mr. Majors as to the objectivity. I represented to Mr. Majors that Mr. Powers is a juror that I would hate to lose. He's a bright guy, and I think that he's bright enough to be able to separate what he hears from the outside from that in the courtroom. [¶] Having that in mind, Mr. Majors has deferred to my judgment in having requested that he not be excused."

Subsequently, during the hearing on defendant's pro se motion for a new trial based on ineffective assistance of counsel, defendant stated that he had told his trial counsel to challenge Powers. Counsel's recollection was "significantly different." According to counsel, defendant "initially wanted [Powers] off. I told him that a person such as that, forthright enough to come forward when he does receive information he's not supposed to receive, in my opinion is going to bend over backwards for you to try not to use that

prejudicial information. And it is certainly a crap shoot to try to have him removed. But I was satisfied with his answers. [¶] And I think one of the other things is that Mr. Powers appeared to me to be a very bright person. He was very attentive throughout the course of the trial and I did want to keep him. [¶] . . . And my recollection is that Mr. Majors deferred to me on what the ultimate decision was." At the conclusion of the hearing, the trial court denied defendant's motion, rejecting his claim that trial counsel had been ineffective.

Defendant now seeks to raise the issue of Powers's inadvertent receipt of outside information on this direct appeal. Apparently recognizing that his trial counsel's failure to challenge Powers has waived the issue for the purposes of appeal (*People* v. *Gallego* (1990) 52 Cal.3d 115, 187-188 [276 Cal.Rptr. 679, 802 P.2d 169]), defendant renews his claim that counsel was ineffective in failing to challenge Powers. The record fails to establish counsel's incompetence. When Powers heard the outside information, he immediately left the sandwich shop and approached the trial court voluntarily, offering his assurances that he would not share what he had heard with other jurors or allow it to enter into his deliberations in any way. Moreover, although Powers heard that Reese had been killed in Arizona, he had no idea when or how this had occurred. Defendant's trial counsel described Powers as a very bright, attentive, and forthright juror who would "bend over backwards . . . to try not to use that prejudicial information." On the present record, we have no basis for second-guessing trial counsel's tactical decision to leave Powers on the jury. (See *People* v. *Lucas* (1995) 12 Cal.4th 415, 487 [48 Cal.Rptr.2d 525, 907 P.2d 373] ["Given the juror's assurance that the conversation had not affected her, and the court's admonition not to discuss the matter with the other jurors, we cannot say that the record establishes any incompetence."].)

### b) *Other Unidentified Jurors*

In addition to Juror Powers, defendant contends that other unidentified jurors also received outside information regarding the killings in Arizona. He bases this claim on the following testimony of Juror Miller at the hearing on the new trial motion:

"[DEFENSE COUNSEL]: Did you ever hear anyone discuss the fact that Robert Reese had been found dead in Arizona?

"[JUROR MILLER]: It was mentioned basically during the deliberations a few times. It was again more speculation.

"[DEFENSE COUNSEL]: All right.

"[Juror Miller]: I didn't know. It was speculation to me.

". . . . . . . . . . . . . . . . . . . . . . . . . . . .

"[Defense Counsel]: You were aware that Mr. Majors was accused of killing other people in Arizona during the course of the trial?

"[Juror Miller]: I had heard that before.

". . . . . . . . . . . . . . . . . . . . . . . . . . . .

"[The Prosecutor]: When did you hear that, sir?

"[Juror Miller]: During the jury deliberations in the last week or so. It was speculated by one member of the jury. It lasted for about ten or 15 seconds and then that was it. Most of the other jury said we don't know that for a fact, that's speculation. So the person that said that, it was just washed out as quickly as it came.

"[The Prosecutor]: When you say accused of killing other people, are you talking [about] Robert Reese or somebody else?

"[Juror Miller]: I believe it was Robert Reese, that it was speculated that he was killed. They didn't really tie Jim to that, they said Robert Reese was killed. And the speculation part of it was who did it.

"[The Prosecutor]: One juror was offering the speculation, to use your word, that Robert Reese was probably dead, that he'd been killed?

"[Juror Miller]: Yes.

"[The Prosecutor]: And that same juror speculated that perhaps Jim had done it or what? I don't understand what you're saying.

"[Juror Miller]: No, it was speculated that he was killed, okay. At that time there was no proof given, it was all speculation. It came briefly who might have done it and then that was the end of it.

". . . . . . . . . . . . . . . . . . . . . . . . . . . .

"[Defense Counsel]: "Maybe you didn't understand my question, Mr. Miller.

"[Juror Miller]: Okay.

"[DEFENSE COUNSEL]: What I asked was specifically isn't it true that you were aware that he was linked to other murders in Arizona during the course of the trial?

"[JUROR MILLER]: No, I was not aware of that during the course of the trial."

Contrary to defendant's assertion, this testimony fails to establish that any of the jurors received outside information. Rather, the testimony establishes only that one juror briefly speculated that Reese might have been killed. As Miller himself noted, "there was no proof given, it was all speculation." Miller's testimony is consistent with the testimony of Foreperson Mohr, which defendant fails to reference. According to Mohr, when the speculation as to Reese's whereabouts occurred, "[a] few of the jurors said we already asked the Judge that in a question, one of the jurors did, and the response from the Judge was it's none of our business, it's not part of the trial. So then we had to tell them, hey, you can speculate all you want but the Judge told us [Reese] is not part of this trial, so just forget about it." Given that the speculation as to Reese's whereabouts lasted only a matter of seconds and given that the jury immediately returned to the trial court's instructions, we conclude that defendant was not prejudiced by the incident.

### D. *Miscellaneous Issues*

#### 1. *Ineffective Assistance of Counsel*

In addition to the specific claims of ineffective assistance of counsel addressed elsewhere in this opinion, defendant advances an across-the-board claim of ineffective assistance of counsel. Defendant maintains that "the general record of this case shows defense counsel . . . was unprepared and unqualified." Although defendant offers a number of examples of trial counsel's alleged deficiencies and lack of preparation, he fails to articulate any prejudice resulting therefrom and, hence, has failed to meet his burden of establishing ineffectiveness. (*People* v. *Cox, supra,* 53 Cal.3d at pp. 655-656.)

Defendant also makes the related argument that he had a due process right to have a "level 6" attorney as his lead trial counsel. According to defendant, level 6 is the highest classification for attorneys in the indigent criminal defense panel system in Sacramento County. As a preliminary matter, we note that the record suggests that defendant's lead trial counsel was, in fact, a level 6 attorney. In any event, defendant enjoys no constitutional right to a particular classification of attorney. ■ As we have held on numerous

occasions, " 'admission of an attorney to the bar establishes that the State deems him competent to undertake the practice of law before all our courts, in all types of actions.' (*Smith* v. *Superior Court* (1968) 68 Cal.2d 547, 559 [68 Cal.Rptr. 1, 440 P.2d 65].)" (*People* v. *Ngo* (1996) 14 Cal.4th 30, 36 [57 Cal.Rptr.2d 456, 924 P.2d 97].) Where, as here, a defendant is represented by a licensed attorney, "a presumption exists in *favor* of the effectiveness of counsel." (*People* v. *Garrison* (1989) 47 Cal.3d 746, 788 [254 Cal.Rptr. 257, 765 P.2d 419], original italics.)

Finally, defendant contends that he is entitled to rely on a presumption of prejudice because there was a total breakdown of the adversary process within the meaning of *United States* v. *Cronic* (1984) 466 U.S. 648 [104 S.Ct. 2039, 80 L.Ed.2d 657]. We disagree. The record does not support defendant's claim that his trial counsel "completely failed to subject the prosecution's case to meaningful adversarial testing."

### 2. *Reliability of Capital Conviction and Death Sentence*

Defendant argues that a general review of the evidence demonstrates that the capital conviction and death sentence are unreliable in violation of the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. There are two aspects to this argument.

First, pointing to the alleged errors addressed elsewhere in this opinion, defendant advances what is, in essence, a claim of cumulative error. As explained above, to the extent the record establishes any errors in the proceedings, it also establishes that they were relatively minor and harmless. The record simply does not support a finding of cumulative error.

Second, defendant points to the fact that both the capital conviction and the death sentence were based, in large part, on the testimony of Bonnie Hogue, a witness defendant characterizes as "a pathological liar." While Hogue was challenged on a number of collateral matters, the key portions of her testimony were corroborated. In his statement to the police, defendant himself admitted he had stayed at a motel with a prostitute named "Bonnie" on the night of the homicides and had taken her shopping the next day. Michelle Blouir confirmed that she had seen defendant with two pairs of gardening gloves shortly before he left for Sacramento. Greyhound records confirmed Hogue's account that she had sent a package to a "Stanley Johnson" at defendant's request. Airline records confirmed that she had booked defendant a return flight home under the same fake identity. And records seized during a search of defendant's residence documented expenses for his trip to Sacramento. Given the strong corroborating evidence

presented by the prosecution at trial, we cannot conclude that Hogue's testimony rendered either the capital conviction or the death sentence unreliable.

### 3. *Challenges to Capital Sentencing Scheme*

 Finally, defendant argues that several features of California's capital sentencing scheme, as interpreted by this court and applied at trial, violate the federal Constitution. Defendant acknowledges that we have previously rejected all of these challenges and advances no persuasive reason for us to reconsider them here. Accordingly, we address them in summary fashion.

California's capital sentencing scheme does not contain so many special circumstances that it fails to perform the constitutionally mandated narrowing function. (*People* v. *Barnett* (1998) 17 Cal.4th 1044, 1179 [74 Cal.Rptr.2d 121, 954 P.2d 384].) Nor does our felony-murder special circumstance fail to perform this function. (*People* v. *Musselwhite* (1998) 17 Cal.4th 1216, 1265-1266 [74 Cal.Rptr.2d 212, 954 P.2d 475].) Prosecutorial discretion in deciding whether to seek the death penalty is constitutional. (*People* v. *Barnett, supra*, 17 Cal.4th at p. 1179.)

As we recently observed in *People* v. *Holt* (1997) 15 Cal.4th 619, 684 [15 Cal.4th 1385a, 63 Cal.Rptr.2d 782, 937 P.2d 213], "there is no statutory or constitutional duty to instruct on the prosecutorial burden at the penalty phase of a capital trial. There, as here, the jury had been instructed that evidence of unadjudicated offenses is subject to the reasonable doubt standard. We concluded that no more was required." Specifically, there is no constitutional requirement that all aggravating factors must be proved beyond a reasonable doubt, that aggravating factors must outweigh the mitigating factors beyond a reasonable doubt, or that death must be found to be the appropriate penalty beyond a reasonable doubt. (*People* v. *Barnett, supra*, 17 Cal.4th at p. 1178.)

The federal Constitution does not require intercase proportionality review. (*People* v. *Bradford* (1997) 15 Cal.4th 1229, 1383-1384 [65 Cal.Rptr.2d 145, 939 P.2d 259].) Although a sentence is subject to intracase review, defendant advances no claim that his sentence was grossly disproportionate to the offenses for which it was imposed. (*Id.* at p. 1384.) There is no categorical constitutional prohibition on the introduction of facts and evidence underlying a defendant's prior felony convictions. (*People* v. *Barnett, supra*, 17 Cal.4th at p. 1178.)

## III. Disposition

For the reasons discussed above, we affirm the judgment in its entirety.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., and Chin, J., concurred.

**MOSK, J.,** Concurring and Dissenting.—I concur generally in the court's opinion. However, I have two reservations.

First, the court approves of a procedure by which questions from jurors to a witness would be repeated by the counsel who produced the witness. Admittedly, there may be a certain logic to that method.

However, not infrequently the question from the juror may be interpreted as being antagonistic to the position of counsel and to the posture of the witness. It would be difficult for counsel to put the question in an impartial manner.

For that reason, I would prefer to require the trial court, rather than either counsel, to restate the juror's question to the witness. As observed in *People v. McAlister* (1985) 167 Cal.App.3d 633, 644 [213 Cal.Rptr. 271]: "[W]hen the court permits a juror to propound questions to a witness, the juror, to some extent at least, represents the court."

While it may not be error for the trial court to permit counsel to restate the juror's question to the witness, I maintain it would be preferable for the court to reframe the query in appropriate form and ask it of the witness itself.

Second, I believe it was error for the trial court to refuse the request of the jury to view the prison cell and environment provided prisoners who have been sentenced to life imprisonment without possibility of parole. Obviously, the jury was giving serious consideration to what punishment would be appropriate for this defendant.

Over many years, there has been considerable public discussion concerning the method of imposing the penalty of death, from hanging to lethal gas to lethal injection. Most members of the public, including jurors, are likely to have a point of view on the several alternatives, though they know the ultimate result is the same: death. That certainly is not true, however, of the

type of confinement imposed on life-without-possibility-of-parole inmates in our prison system. Surely for such inmates, prison is not a pleasant country club. The restrictive facilities for prisoners who are never to be beneficiaries of parole, and the constraints to which they are subjected, are matters that may properly be considered by the jury in determining the appropriate punishment.

A visit to prison facilities for the 12 jurors in this case could easily have been arranged, and, since it was requested by them, it must have had some significance in their deliberations. It should not have been refused.

With the foregoing exceptions, I concur in the court's opinion.

Appellant's petition for a rehearing was denied September 2, 1998.