Filed 3/28/14  P. v. Oliver CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>HENRY L. OLIVER,<br><br>     Defendant and Appellant. | A132263<br><br>(Alameda County<br>Super. Ct. No. 164301) |

Henry L. Oliver (appellant) appeals from a judgment entered after a jury found him guilty of human trafficking (Pen. Code, § 236.1, subd. (c)[1]) and committing lewd acts on a child under 14 during an aggravated kidnapping (§§ 288, subd. (a), 667.61, subd. (d)(2)).  He contends:  (1) the evidence was insufficient to show a "continuous" aggravated kidnapping covering all of the lewd act counts; (2) the trial court failed to instruct on " 'continuing period of detention' "; (3) the court failed to properly instruct on "consent" and "belief as to consent"; (4) the court failed to sua sponte instruct on the lesser included offense of a lewd act during a simple kidnapping; (5) the court failed to sua sponte instruct on the lesser included offense of false imprisonment; (6) the totality of circumstances shows that his admission of two prison priors was not knowing and voluntary; and (7) a six-year term for human trafficking constituted double punishment

---

[1]All further statutory references are to the Penal Code unless otherwise stated.

1

for the same conduct and was improperly used to qualify him for a life term under section 667.61. We reject the contentions and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

An amended information was filed on February 1, 2011, charging appellant with human trafficking of a minor (§ 236.1, subd. (c), count 1), 24 counts of committing a lewd act on a child under the age of fourteen during an aggravated kidnapping (§§ 288, subd. (a), 667.61, subd. (d)(2), counts 2–25), and one count of procuring a child under the age of sixteen for a lewd act (§ 266j, count 26).[2] The information also charged appellant with having had five prior convictions and having served two prior prison terms (§ 667.5, subd. (b)).

Jury trial commenced on January 5, 2011. During jury deliberations, appellant stipulated to the prior prison terms. On February 10, 2011, the jury convicted appellant on counts one through eight and acquitted him on the remaining counts. For each count on which it found appellant guilty of committing a lewd act with a child, the jury also found the aggravated kidnapping circumstance to be true.

On June 3, 2011, the trial court heard and denied appellant's motion for a new trial. The court sentenced appellant to a total term of 33 years-to-life in prison, comprised of the mid-term of six years on count one, a year consecutively for each of the two prior prison terms, and 25 years-to life for the aggravated kidnapping on count two. The sentences on counts three through eight were stayed and the remaining aggravated kidnapping sentences were stricken. Appellant received 509 days of presentence credits consisting of 443 actual days and 66 days of conduct credits. Appellant filed a timely notice of appeal.

Jane Doe[3] was born in 1997 and was fourteen-years-old and attending seventh grade at the time she testified in this case. Doe ran away from home for the first time in

---

[2]Counts nine through twelve were alleged to have occurred in Contra Costa County and the remaining counts in Alameda County.

[3]The victim was referred to as Jane Doe throughout the proceedings below, and we shall do the same in this opinion.

2

November 2009 because she was upset that her father had walked out on her family, and because there was "nothing at home for [her]." She described herself as a "daddy's girl" who "needed [her] dad in [her] life" and testified, "I felt like if he can leave, then I can too." She left home with $50 her mother had given her for a bus pass. She met a girl on International Boulevard in Oakland who said she made a lot of money as a prostitute. Because Doe needed money to survive, she decided to try working as a prostitute. She stayed with different people, including a man named Jay Rich (Rich), but did not give the money she earned to a pimp. She had various names, including Crystal, Luscious, Chocolate, and Tomarionna, and told people she was 19 years old.

Eventually, Doe was returned to her mother's home and was grounded for running away. On March 1, 2010, she ran away again. She saw Rich and "went with him" because she liked him. He bought her things, helped her out, and did not act violently towards her. On her first night, she stayed with him at a hotel. She had one "date" on her first day working as a prostitute with him and gave him $40 of the $60 she earned.

Doe first saw appellant—who she came to know by his nickname, Swift—on March 1, 2010 when she was working in Richmond on 23rd Street. Appellant was a passenger in a "[c]hampagne goldish" colored Lexus.[4] The Lexus did not stop that day, but she saw it again the next day when she was working in the area of Stanford Street and San Pablo Avenue in the Berkeley, North Oakland, Emeryville area. Doe had just exited the car of a customer and was walking back to San Pablo Avenue when she saw the Lexus parked across the street. Appellant and his friend were there. Appellant got out of the car and started walking towards Doe, who felt scared because of the way he was looking at her, and because she could tell he was a pimp. Doe started to "circle the other way" and appellant walked towards her, then in front of her, to block her way. He said, " 'Either you get in the car or me and my friend are going to chase you.' " She started to run but appellant grabbed her arm. She felt threatened and was afraid of being chased, so she got in the car. Appellant's friend was sitting in the front passenger seat.

_____

[4]Appellant's mother was the owner of the Lexus.

3

They went to pick up another prostitute, "Busy," near Golden Gate Elementary School in Berkeley. They then drove to Telegraph Avenue and 55th Street to pick up another prostitute, "Lil Mama." From there they drove to a Motel 6 on the Embarcadero in Oakland and dropped off Busy and Lil Mama. While they were driving around, Doe had a brief telephone call with Rich and sent him three text messages to tell him she had been picked up by another pimp. She was scared and hoped that Rich would pick her up. Appellant soon took her cell phone from her.

Appellant took Doe to a music studio in downtown Oakland where she observed approximately ten to twenty men.[5] Appellant told Doe she needed to make $300 for him if she wanted to leave the studio. Doe understood this to mean she had to perform acts of prostitution. Appellant then left Doe in the room with the other men. Doe felt sad and angry because she wanted to leave. She believed the other men were also pimps, and that her only choices were to earn the money for appellant or ask one of the other men to become her pimp.

Eventually appellant and his friend—who Doe later learned was nicknamed Dame—took Doe back to the Lexus. They picked up another girl, Apple Bottoms, and returned to Motel 6 in the late afternoon. Appellant gave Doe some marijuana to smoke and cognac to drink. After ingesting the drugs and alcohol Doe became more comfortable around appellant. Appellant then directed Busy to take nude photographs of Doe to post on the internet, which Busy shot in the bathroom. That night, appellant had vaginal sex with Doe while Dame, Busy, Lil Mama and Apple Bottoms were in the room, or in the bathroom. Doe slept in the motel that evening. When she awoke the next morning appellant and Apple Bottoms were gone, and Busy and Lil Mama were performing oral sex on Dame. Dame threw a bottle cap at Doe and told her to join in orally copulating him. She complied, then went back to sleep.

When appellant returned, Doe, Dame, Busy and Lil Mama got back in the Lexus and drove to Sacramento, where they stopped at the apartment of a girl named Slim and

_____

[5]On cross-examination, Doe stated that Busy and Lil Mama were also at the music studio.

4

smoked marijuana. They then drove to a motel, and appellant and Dame dropped off Doe, Busy, and Lil Mama and returned a little while later. Busy was taken to a date while Doe and Lil Mama went to work walking Folsom Boulevard. Doe had one date and gave the money to appellant. The group spent two days in Sacramento with Doe working both days on Folsom Boulevard. They then drove to a Motel 6 on Tully Road in San Jose.

When they arrived at Motel 6, appellant, Dame and Lil Mama left, and Doe had a date with a Mexican man she picked up on Tully Road. After paying Doe, the man demanded his money back, and Busy pretended to call the police, but instead called Dame. Appellant and Dame returned to the motel, beat up the Mexican man, and took his money. The Mexican man went to a nearby police officer who responded to the room. Police officer Anthony Torres, who was dispatched to the room at about 11:50 p.m., found three males—Caesar Rios, appellant and Damian Ferrara, or Dame— and three females. The females said their names were Shanei Davis, Brandie Pinky-Jones and Tomarionna Johnson, and Tomarionna Johnson gave her date of birth as January 20, 1991, which would have made her nineteen years old at the time. Doe testified that she gave the fake name and birth date because she did not want the officer to know she was a runaway, and did not want him to return her to her home. Doe initially told appellant she was 19 years old because she believed if she told him her actual age he would leave her and she would not have anywhere to go. At some later date, appellant again asked Doe her age and she told him she was 17. Torres ran a warrant check and arrested appellant. The rest of the group returned to Oakland and stayed overnight at Dame's sister's house in East Oakland.

In the morning, Dame brought appellant back. Appellant told Doe to go to International Boulevard, and she and Lil Mama and Busy went there to prostitute. Doe was not certain how many days she stayed in Oakland. The group returned to Sacramento and stayed there for two days. She worked on Stockton Boulevard with Lil Mama and Busy. Doe believed she had three dates while working on Stockton Boulevard. Appellant never told Doe how much to charge for a date. She always gave

5

the money to appellant because she feared appellant would beat her. Busy told Doe that Dame had twice broken her cell phone and had also broken her laptop. Doe trusted Busy and Lil Mama because they were older and had befriended her. While the relationship Dame had with Busy and Lil Mama was not clear, Doe considered only appellant to be her pimp, not Dame.

From Sacramento, the group traveled to Richmond. They stayed at Dame's sister's house and Doe went to work on 23rd Street. In Richmond, Doe had one date with a man named Manny who took Doe to his hotel for vaginal and oral sex. She gave the money she received from Manny—which she believed was $150—to appellant, and they returned to Dame's sister's house. The group spent the night in Richmond and returned to Oakland the next day. Back in Oakland, Doe worked the street on International Boulevard and gave the money she received to appellant. Appellant would drive by at times and would look at Doe as she worked the street. He would sometimes stop his car, and she would hand him her money.

In addition to working the street, Doe also had dates that appellant "set [her] up on." For example, on one occasion, appellant took Doe to a house in Berkeley. Once inside, appellant spoke to a "dark-skinned," "older," "bald," man. He told Doe, "You're going to date him," then left the house. Doe understood that to mean that she was going to have sex with the man. Doe and the man had vaginal sex, and she was at the house for "a long time." "[W]hen the sex was done," appellant came back and spoke to the man, who told appellant that he wanted Doe to stay longer. Doe therefore stayed longer and had vaginal sex with the man again. Doe never received any money and did not see the man give any money to appellant. Appellant returned to the man's house and told Doe to take a shower, which she did.

Appellant gave Doe a new cell phone so he could call or text her when she was working the streets. She listed him in her contact by his nickname, Swift, but appellant changed the name to Bill so that if Doe were caught working, the police would not be able to identify him as her pimp. Appellant took Doe to discount stores to buy her clothes, and he bought food for her. He decided when and where Doe would work, and

6

he paid for the hotels in which they stayed. He brought Doe to his mother's house on two occasions. She had sex with appellant on almost all of the days she was with him, and she had oral sex with him "[e]very day and every night," once in the morning before she went to work, and once at night when she was done working for the day. She did not feel she could decline when appellant wanted to have sex. On one occasion, when she told him she was not in the mood to have sex, he replied in a demanding voice, "Well, you better get in the mood." Doe believed appellant would beat her if she did not comply, so she would "just do it so I wouldn't get beat." She also could not decline to work because she believed he would beat her if she did so. On one occasion, while Doe was having vaginal sex with appellant, appellant forced his penis into her anus. Doe tried to move away because she did not want him to do that, because she was surprised and scared, and because it was painful. Appellant "said something" but she could not remember what he said, and she could not remember if appellant hit her when she tried to move away.

Doe testified that she believed appellant would beat her if she refused to have sex with him because he had threatened her a couple of times, and because she heard appellant, Dame, Busy, and Lil Mama talking about how appellant beat "his other girl before [Doe]" by taking off his belt and "whacking at her" when she refused to go walk the streets because it was cold outside. After appellant "whacked" the girl, she agreed to work and went back outside. On one occasion, when Doe did something to make appellant angry, he pulled out his belt and she was afraid he was going to hit her with it. Instead, he said, "You lucky you're cute and I like you," then walked out of the room. Doe also knew that Dame had beat one of the girls when she did something to make him mad. This made Doe surprised and a little frightened. Doe testified that when she first got picked up by appellant, she was planning out in her head how she was going to escape. When he took her phone, she felt she had no options and that she would not be able to escape because appellant would find her.

On or about March 17, 2010, appellant and Doe checked into the Motel 6 on Hegenberger Road in Oakland. The next day, March 18, 2010, she had a feeling that "something was going to happen," so instead of working "outside," she stood in an

7

alleyway near International Boulevard.  A man in a truck drove up and wanted a date, but he changed his mind when a police car went by.

Oakland police officers Hamann Nguyen and James Saleda were working undercover that afternoon in their assignment in the Child Exploitation Unit.  At about 4:20 p.m., Saleda observed Doe near the alleyway by International Boulevard.  He asked Doe how much she would charge for oral sex, and whether she had a room.  Doe told him it would be $40 for oral sex and pointed in the direction of her hotel.  Saleda called for back up officers to arrest Doe.  Doe heard police sirens and started to walk off, but police came down the alley and arrested her.  Nguyen suspected Doe was a juvenile, and confirmed that she was when he obtained her personal information.

Doe identified her pimp as Swift and said that his real name was Henry Lee Oliver.  The pimp's name was listed as Bill on the cell phone she had, which belonged to "her pimp."  Nguyen noticed while he was with Doe that she received as many as eight text messages and a phone call from Bill.  After Nguyen let the phone call ring through to voice mail, a text message from Bill came in asking, "Why aren't you answering your phone?"  Nguyen asked Doe to respond that she was busy with a "trick."[6]  Bill replied, "Okay, babe, but when I text, text back."  Doe responded, "Okay, Daddy, I'm trying to get you this dough."  Bill replied, "Okay, but don't be so nice."

Doe told Nguyen that she had been forced into prostitution and wanted her pimp arrested "for forcing her to be out there."  Nguyen spoke to his supervisors and they decided to set up a plan to lure appellant out to arrest him for prostituting a juvenile.  Nguyen told Doe to call him back and tell him she had $200 from the john who had just left, and that there was another pimp in the area who was following her and was trying to "take her."  Doe did as instructed, and Nguyen heard a male voice saying, "You have $200?" and Doe answering, "Yes."

---

[6]Nguyen testified that Doe typed the texts herself with his coaching because he wanted the texts to appear to have been written by Doe.  Doe testified that Nguyen typed the messages to appellant.

8

Doe, as instructed, arranged for appellant to meet her at the Burger King at 14th Avenue and East 12th Street in Oakland. Nguyen ran appellant's name in his computer and showed the photograph to Doe to confirm he was the person for whom they were waiting. After a while a blue Pontiac with a female driver and male passenger slowly entered the parking lot. When the vehicle passed the drive-through without stopping, the police stopped the car and appellant exited. Appellant's cell phone was discovered during a search of the car. Comparisons of the contact lists and call logs for Doe's cell phone and the cell phone found in the car in which appellant was a passenger confirmed that the calls exchanged after Doe's arrest were with appellant.

Saleda testified as an expert in "street trafficking, prostitution, pimping and child exploitation." He explained that there are essentially two types of pimps. A "guerilla pimp" drives around and "snatch[es]" a girl off the street and "uses fear of force to get a girl to work for [him]." Often a guerilla pimp will take the girl to a "break house" to "break her down, have his friends have sex with her until she agrees to work for him." The second type is the "Romeo pimp," who manipulates the girl with attention and love. He tries to make his girls feel they are a part of his family and will sometimes give the girls marijuana and alcohol to make it easier for the girls to work. Often, pimps will have a new girl work with other girls to create a "family type of atmosphere." Both tactics of the guerilla pimp and the Romeo pimp are used to control the girls. Saleda testified that approximately eighty-five percent of girls who were on the street were there because they had been sexually, physically, or emotionally abused, and were looking for "any type of attention." Pimps avoided girls who appeared confident and targeted girls who had been sexually abused because they were "already numb" and "easy to break down."

Saleda testified that pimps take their girls to work "the circuit" around the Bay Area, moving the girls from city to city, including Oakland, San Jose, Sacramento, and Santa Rosa. There are "tracks" in each city where pimps put the girls up in cheap motels near where they will be working, such as the Motel 6 on Tully Road in San Jose. Pimps move the girls around because they know that if they are in one city too long, "the girls get known, the police may target them, or they may get a warrant in that city." Pimps

9

almost always give their girls a cell phone, which allows the girl to have customer contact, and allows the pimp to track the girl.

Saleda testified that pimps refer to what they do as "the game." One rule of the game is that if a pimp is standing on the corner, a prostitute who is walking down the street must not look him in the eye and must walk around him. If she breaks that rule, the pimp may consider her his, and will "take the girl regardless of whether or not she wants to go with him." The new pimp then has the option of keeping her as his own, or "ransom[ing] her back to her [old] pimp." Another rule is that a prostitute must not keep any money, and will suffer consequences if she tries to do so. Saleda testified that the first rule of the game is "you don't give up your pimp." Pimps also direct their girls to list them in the cell phone contact list under a common first name so if the girl is arrested it will not be immediately apparent who her pimp is. When arrested, girls often do not give police their real names.

Saleda described Doe as "one of the most cooperative victims I dealt with in a long time." She did not take a long time or stall in answering questions. At the time of Doe's arrest, the police had been searching for her as a missing person at risk. They had been in contact with Doe's mother and knew she was looking for Doe.

## DISCUSSION

### 1. Continuous Kidnapping

Appellant contends that even if the evidence shows he kidnapped Doe when he placed her in his car on San Pablo Avenue in Oakland, the evidence was insufficient to show the kidnapping continued throughout the period in which the lewd and lascivious acts occurred. We disagree.

In reviewing the evidence, this court "must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, [any] rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.]" (*People v. Davis* (1995) 10 Cal.4th 463, 509.) " 'Substantial evidence' is evidence which is 'reasonable in nature, credible, and of solid value.' [Citation.]" (*People v. Morgan* (2007) 42 Cal.4th 593, 614.) The reviewing court must " 'presume in support of the

10

judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citations.]" (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1237.)

The jury convicted appellant of seven counts of lewd and lascivious acts against Doe in violation of section 288, subdivision (a). For each count, the jury found true the allegation under section 667.61, subdivision (d)(2), that appellant "kidnap[ped] the victim . . . and the movement of the victim substantially increased the risk of harm to the victim over and above that level of risk necessarily inherent in the commission of that offense . . . ." "The plain wording of this enhancement requires two elements: (1) a simple kidnapping (§ 207, subd. (a)); and (2) a substantial increase in the risk of harm to the victim." (*People v. Diaz* (2000) 78 Cal.App.4th 243, 246, fn. omitted.)

Section 207, subdivision (a), defines simple kidnapping: "Every person who forcibly, or by any other means of instilling fear, steals or takes, or holds, detains, or arrests any person in this state, and carries the person into another country, state, or county, or into another part of the same county, is guilty of kidnapping." The forcible detention of a victim is an element of kidnapping; "therefore, as long as the detention continues, the crime continues." (*Parnell v. Superior Court* (1981) 119 Cal.App.3d 392, 407–408 (*Parnell*); see also *People v. Thomas* (1994) 26 Cal.App.4th 1328, 1334, *People v. Masten* (1982) 137 Cal.App.3d 579, 588, disapproved of on different grounds by *People v. Jones* (1988) 46 Cal.3d 585, 592, fn. 4.)

In *Parnell*, the defendant kidnapped seven-year-old Steven S. in 1972 and sexually abused him. (*Parnell, supra*, 119 Cal.App.3d 392, 398.) The defendant changed Steven's name, enrolled him in school, and told him he had gone to court and obtained custody of him. (*Id*. at p. 398.) Steven was often cared for by babysitters and was also "outside [the defendant's] control" while in school and while the defendant was at work. (*Id*. at p. 399.) He also periodically stayed overnight at friends' houses, traveled out of town with his football team, went to the movies, had access to bicycles, made phone calls to his friends, mailed letters without the defendant's knowledge, and was in police custody for a brief time when he was caught shoplifting. (*Ibid.*) Despite the new life and identity the defendant had created for him, Steven never forgot his parents or his true

identity, and testified at trial that he knew at all times the defendant "had [him] improperly." (*Ibid.*) Finally, in 1980, when Steven learned that the defendant had abducted another little boy, he left the defendant's home with the boy while the defendant was at work, coached the boy how to enter the police station to turn himself in, then walked away. (*Id*. at pp. 399–400.) When the boy became scared and ran after Steven, the police brought both boys back to the station. (*Id.* at p. 400.) After some coaxing, Steven identified the defendant as his abductor. (*Ibid*.)

The defendant, who was charged with kidnapping and other crimes, moved to set aside the information asserting, among other things, that the statute of limitations had expired on his 1972 kidnapping of Steven. (*Parnell, supra,* 119 Cal.App.3d at pp. 401, 405–406.) The Court of Appeal upheld the trial court's denial of the motion, holding the kidnapping was a continuing offense that did not end until the detention ended. (*Id*. at pp. 407–409.) The court held that while Steven "enjoyed considerable freedom of movement and association," it was not "unreasonable to infer that the boy, who had been subjected to continual sexual abuse and taken far from his home and family, remained with [the defendant] out of fear." (*Id*. at p. 409.)

Although there are factual dissimilarities between *Parnell* and the present case, the same principles apply. Appellant argues that any kidnapping that occurred when he placed Doe in his car "concluded" when "appellant discussed Doe working for him" and "Doe was returned to the street." In his view, everything that occurred after that was Doe's choice. He argues that because the detention ended when he put Doe to work on the streets, the lewd and lascivious acts he performed on her did not occur during the kidnapping. Appellant makes much of Doe's apparent willingness to stay with the group, particularly on the night he was arrested in San Jose, when Doe gave a false name and birth date to police so that she would not be required to go home. Doe, however, testified that after appellant forcibly placed her in his car and took her cell phone, she felt she could not do anything and that he would find her if she left. She also testified that she was frightened after appellant threatened her with a belt, and after she heard he had beat "his other girl" with a belt when she refused to do as instructed. Appellant also took all

12

the money she made and made her dependent on him for her survival by, among other things, buying all of her clothes and food, thereby making her particularly vulnerable to his assertion of authority.

Moreover, there was evidence that Doe was a "daddy's girl" who felt there was nothing left for her at home after her father left the family. Appellant, who initially used what Saleda described as "guerilla pimp" tactics by sending Doe to a break house and scaring her, later used "Romeo pimp" tactics by using Doe's family background to his advantage by surrounding her with other girls who befriended her, giving her marijuana and alcohol so she would be more comfortable, and making her feel like she was part of a family. Under the circumstances confronting Doe—a thirteen year old runaway who was scared to go home and afraid appellant would find her if she left—the jury could reasonably find that she was not free and that the kidnapping did not end until she was taken into custody on March 18. Accordingly, there was substantial evidence supporting the jury's finding that Doe was kidnapped at the time the lewd and lascivious acts occurred.

## 2. Jury Instruction – "Continuing Period of Detention"

Appellant contends that because the prosecution's theory of the case was that Doe remained a kidnapping victim from the time she was placed in his car until she was taken into police custody, the trial court was required to instruct the jury on the phrase, "continuing period of detention." We reject the contention.

" ' "It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." [Citation.]' " (*People v. Middleton* (1997) 52 Cal.App.4th 19, 30, disapproved on other grounds in *People v. Gonzalez* (2003) 31 Cal.4th 745, 752–753, fn. 3.) "The language of a statute defining a crime or defense is generally an appropriate and desirable basis for an instruction, and is ordinarily

13

sufficient when the defendant fails to request amplification." (*People v. Poggi* (1988) 45 Cal.3d 306, 327.)

Here, the trial court properly instructed the jury with the elements of the enhancement under section 667.61, subdivision (d)(2), when it instructed the jury with CALCRIM No. 3175.[7] Because CALCRIM No. 3175 correctly states the law, the court satisfied its duty of instructing the jury on the general principles of the law that applied in the case. Appellant asserts the court had a sua sponte duty to go beyond CALCRIM No. 3175 and provide an instruction regarding "continuous period of detention." However, such an instruction would have been a "pinpoint instruction," which is an instruction that " 'relate[s] particular facts to a legal issue in the case or "pinpoint" the crux of a defendant's case, such as mistaken identification or alibi,' " and which a court is not required to give unless it is requested, and unless there is " 'evidence supportive of the theory.' " (*People v. Gutierrez* (2009) 45 Cal.4th 789, 824, quoting *People v. Saille* (1991) 54 Cal.3d 1103, 1119.) If appellant wanted a pinpoint instruction, it was his burden to request it from the trial court. (*People v. Gutierrez*, *supra*, 45 Cal.4th at p. 824.) He cannot raise the issue for the first time in this court.

---

[7] The instruction, as given, provided: "If you find the defendant guilty of the crimes charged in Counts Two through Twenty-Five [lewd and lascivious acts] you must the[n] decide whether, for each crime, the People have proved the additional allegation that the defendant kidnapped Jane Doe, increasing the risk of harm to her. You must decide whether the People have proved this allegation for each crime and return a separate finding for each crime. [¶] To prove this allegation, the People must prove that: [¶] 1) The defendant took, held, or detained Jane Doe by use of force or by instilling reasonable fear; and [¶] 2) Using that force or fear, the defendant moved Jane Doe or made her move a substantial distance; and [¶] 3) The movement of Jane Doe substantially increased the risk of harm to her beyond that necessarily present in the lewd act; and [¶] 4) Jane Doe did not consent to the movement; and [¶] 5) The defendant did not actually and reasonably believe that Jane Doe consented to the movement. [¶] Substantial distance means more than a slight or trivial distance. The movement must be more than merely incidental to the commission of the lewd act. In deciding whether the distance was substantial and whether the movement substantially increased the risk of harm, you must consider all the circumstances relating to the movement. [¶] The People have the burden of proving each allegation beyond a reasonable doubt. If the People have not met this burden, you must find that the allegation has not been proved.

14

In any event, even assuming he had made a request, we would conclude the trial court was not required to provide the pinpoint instruction. Appellant provides us with no authority for his position that an instruction regarding the phrase "continuing period of detention" was required, and does not propose the language of the instruction he claims the trial court was required to give. Instead, he draws the phrase from language in cases such as *People v. Parnell*, *supra*, 119 Cal.App.3d at pages 407–410 and *People v. Thomas*, *supra*, 26 Cal.App.4th at page 1334, in which the court used the term to describe what had occurred.[8] "Language in an appellate court opinion which may be a good statement of law or of the reasoning of the appellate court does not necessarily make a good jury instruction." (*People v. Adams* (1987) 196 Cal.App.3d 201, 204–205; see also *People v. Colantuono* (1994) 7 Cal.4th 206, 221, fn. 13.) The fact that appellate courts have discussed the concept of "continuing period of detention" does not mean the trial court was required to give it in a jury instruction in this case.

Appellant nevertheless asserts the court should have provided further instruction because the jury, which submitted several questions during deliberations, must not have understood the phrase. He argues, for example, that the jury's question—"can substantial distance be measured from a single point for all counts or from each individual occur[re]nce or count?"—shows it was confused as to the meaning of continuing period of detention. The question, however, addressed the movement requirement of the enhancement under section 667.1, subdivision (d)(2). In essence, the jury was asking whether each count required a new movement of the victim, or whether a single

_____

[8]Continuing detention is a fact-specific concept that courts have used for a variety of purposes, such as bringing a long-term detention of a child within the statute of limitations for kidnapping (*People v. Parnell*, *supra*, 119 Cal.App.3d at pp. 407–409) and limiting the number of kidnapping charges a defendant faces where a single abduction continues over a period of time (e.g., *People v. Thomas*, *supra*, 26 Cal.App.4th at p. 1334 [kidnapping for the purpose of robbery was a single kidnapping despite the fact that the defendant later stopped his car to commit numerous sex offenses against victim before driving the victim to her apartment]). The "continuing period" may be a matter of hours (*Thomas*, *supra*, 26 Cal.App.4th at pp. 1331–1332) or several years (*Parnell*, *supra*, 119 Cal.App.3d at pp. 398–400). The courts in these cases did not hold that a jury instruction regarding the concept was required.

movement could suffice for all counts. This question does not mean, as appellant asserts, that the jury had doubts as to Doe's continuing detention. Rather, it showed the jury believed that appellant and Doe may not have always moved to a new location prior to each lewd act. The court adequately responded to this question by stating, "Depending on the facts as you find them to be, the substantial distance for kidnapping can be one continuous act from the initial event on March 3, 2010 to the concluding sex act with the defendant, on or about March 18, 2010 or it could be measured by each incident, or combination thereof. [¶] To find the kidnapping allegation to be true all jurors must agree that the defendant committed the same act or acts. It is not necessary that the particular act agreed upon be stated in your verdict. This instruction should be read in conjunction with all the other instructions which are applicable to the facts as you have found them to be." Appellant does not assert that this was an incorrect statement of the law, and we conclude it was appropriate. Read in conjunction with CALCRIM No. 3175, the jury would have understood that while the movement for purposes of finding that appellant kidnapped Doe could be one continuous act, the lewd and lascivious acts had to occur during any kidnapping for the enhancement to apply. There was no error.[9]

### 3. Jury Instruction – "Consent" and "Belief as to Consent"

Appellant contends the trial court was required to instruct the jury sua sponte with CALCRIM No. 1215 as to "consent given" and "good faith belief in consent," and that the court's answers to the jury's questions relating to consent diluted the People's burden of proof. We reject the contention.

CALCRIM No. 1215 provides: "Defense: Consent Given [¶] The defendant is not guilty of kidnapping if the other person consented to go with the defendant. The other

---

[9]To the extent appellant is arguing that the term "continuous" as used by the court in its response to the jury's question should have been defined, we conclude there was no such need because the court is not required to provide a definition where a word or phrase has a commonly understood or non-technical meaning. (See, e.g., *People v. Rodriguez* (2002) 28 Cal.4th 543, 546–550 ["recurring access"]; *People v. Smithey* (1999) 20 Cal.4th 936, 980–981 ["maturely and meaningfully reflected"]; *People v. Miranda* (2011) 199 Cal.App.4th 1403, 1421–1422 ["legal consent"].)

16

person consented if (he/she) (1) freely and voluntarily agreed to go with or be moved by the defendant, (2) was aware of the movement, and (3) had sufficient maturity and understanding to choose to go with the defendant. The People have the burden of proving beyond a reasonable doubt that the other person did not consent to go with the defendant. If the People have not met this burden, you must find the defendant not guilty of this crime." It also provides: "Defense: Good Faith Belief in Consent [¶] [The defendant is not guilty of kidnapping if (he/she) reasonably and actually believed that the other person consented to the movement. The People have the burden of proving beyond a reasonable doubt that the defendant did not reasonably and actually believe that the other person consented to the movement. If the People have not met this burden, you must find the defendant not guilty of this crime.]"

Here, the trial court—while not using the language provided in CALCRIM No. 1215—did define the terms "consent" and the defendant's "belief as to consent." First, in response to the jury's question regarding whether Doe had the legal capacity as a minor to consent, the trial court stated, "And just to refresh your recollection that's the instruction that deals with kidnapping as an allegation which is part of the charges here. And Item No. 4 and No. 5 enumerated that the things that the People must prove including that Jane Doe did not consent to the movement. [¶] The answer is, yes, she can consent but it must be considered in light of the following context: [¶] To consent to an act or transaction a person must, one, act freely and voluntarily and not under the influence of threats, force or duress; two, have knowledge of the true nature of the act or transaction involved; and three, possess sufficient mental capacity to make an intelligent choice whether to do or not to do something proposed by another person. In deciding whether Jane Doe consented to the movement, you should consider the totality of the circumstances surrounding the event and Jane Doe's age." Defense counsel agreed with this response prior to the trial court reading it to the jury.

Second, the jury asked the following question: " 'The defendant did not actually and reasonably believe that Jane Doe consented to the movement.' Must he believe that Jane Doe consented in the same way the court defined consent in response to [the prior

17

question regarding consent?]" The trial court responded, "And I went back to your earlier question that brought about the Court's instruction to you on consent. And that question focused on Jane Doe. Basically it asked: As a minor at age 13, does she legally have the ability to consent to movement? And so that definition, in that context, was really directed towards whether or not a 13 and under, what circumstances and what you should consider. So my short answer to your question is does that definition apply to the defendant? And the answer is the best definition of what is supposed to be considered is what is set forth in the language. Because we're dealing with different contextual settings. And the language here is the defendant did not actually and reasonably believe that Jane Doe consented to the movement. It means just that. Under the totality of the circumstances, is it reasonable for the defendant to believe that Jane Doe was consenting to the movement, whatever it is. And I don't necessarily have any further definition than that and I apologize if it doesn't really help. Hopefully, it does. Just given the plain language of the words. It's normal interpretation. And take a look at it. Is it reasonable that the defendant believed that she was consenting to movement given the totality of the circumstances. And there's a lot of circumstances there for you to consider." Defense counsel did not object to this response.

Appellant does not contend that the trial court's definition of "consent" or "belief as to consent" was wrong.[10] Instead, he asserts the court should have used CALCRIM No. 1215 instead of using its own language to respond to the jury's questions because when he told the jury to consider the terms "consent" and "belief as to consent" under "the totality of the circumstances," thereby "replac[ing] reasonable doubt with totality of the circumstances." He argues, "The 'totality of the circumstances' is not the same as 'beyond reasonable doubt,' and indeed diluted the standard of proof."

---

[10]The court drew its language regarding consent from *People v. Davis* (1995) 10 Cal.4th 463, 517, in which the California Supreme Court held that the language used by the trial court in that case, while not ideal, was a correct statement of the law, and that it was therefore not error for the trial court to instruct as it did.

18

We disagree that the trial court's responses to the jury's questions "diluted the standard of proof." Rather, the court was explaining to the jury that in evaluating both Doe's consent and appellant's good faith belief as to her consent, it should consider all of the evidence relevant to those issues, rather than a single factor—such as Doe's age—in isolation. The court did not use the term "totality of the circumstances" in manner related to the burden of proof. Further, the jury had been instructed separately and repeatedly that the People had the burden to prove every element beyond a reasonable doubt, including the two elements for which consent was an issue, and the trial court instructed the jury with CALCRIM No. 220 – Reasonable Doubt, which stated in part, "Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt unless I specifically tell you otherwise." Defining the terms relating to consent did not obligate the court to reinstruct the jury on the burden of proof. We presume a jury is capable of understanding and correlating all jury instructions that are given. (*People v. Yoder* (1979) 100 Cal.App.3d 333, 338.) We have no reason to believe the jury was unable to do so in this case.

### 4. Simple Kidnapping as a Lesser Included Offense

Appellant contends the trial court was required to instruct sua sponte that it could find him guilty of the "lesser included offense of committing a lewd act during a *simple* kidnap." We review this issue de novo (*People v. Waidla* (2000) 22 Cal.4th 690, 733), bearing in mind that an offense is a lesser included offense if "either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser." (*People v. Birks* (1998) 19 Cal.4th 108, 117.)

The offense of simple kidnapping (§ 207) is a lesser included offense of aggravated kidnapping (§ 209). Thus, an instruction on the lesser included offense would have been appropriate if appellant had been charged with aggravated kidnapping (§ 209). He was not. Rather, he was charged with 24 counts of committing a lewd act with a child under the age of fourteen, and for each such count, there was an enhancement allegation that he kidnapped the victim "and the movement of the victim substantially increased the

19

risk of harm to the victim over and above that level of risk necessarily inherent in the commission of that offense, within the meaning of . . . section 667.61(d)(2)." The information further alleged that appellant was "punishable under the provisions of section 667.61(a) . . . ." In other words, the kidnapping allegations acted to bring each count of a lewd act with a child within the ambit of the One Strike sentencing law.

In *People v. Majors* (1998) 18 Cal.4th 385, 410–411 (*Majors*), the California Supreme Court held that a trial court's obligation to instruct sua sponte on a lesser included offense does not extend to enhancements. One of the primary reasons for requiring instructions on lesser included offenses is " 'to eliminate the distortion of the factfinding process that is created when the jury is forced into an all-or-nothing choice between [guilt] and innocence' "—that is, to eliminate " 'the risk that the jury will convict . . . simply to avoid setting the defendant free.' " (*Schad v. Arizona* (1991) 501 U.S. 624, 646–647.) This risk is wholly absent with respect to enhancements, which a jury does not even consider unless it has already convicted defendant of the underlying substantive offenses. (See generally, *People v. Wims* (1995) 10 Cal.4th 293, 307 ["[A] sentence enhancement is not equivalent to a substantive offense, because a defendant is not at risk for punishment under an enhancement allegation until convicted of a related substantive offense. . . . At that time, a defendant's liberty interest 'has been substantially diminished by a guilty verdict.' [Citation.] The Legislature, moreover, has in various ways expressed its intention that enhancements *not* be treated as substantive offenses."].) Under these circumstances, we hold that a trial court's sua sponte obligation to instruct on lesser included offenses does not encompass an obligation to instruct on "lesser included enhancements." (*Ibid.*) Similarly, here, because the jury was asked to make the determination under section 667.61, subdivision (d)(2), only after it had found appellant guilty of the offense of lewd and lascivious conduct, there was no risk that it would be forced into an "all-or-nothing" choice. (See *Schad v. Arizona*, *supra*, 501 U.S. at pp. 646–647.)

Appellant tries to distinguish *People v. Majors, supra,* 18 Cal.4th 385 by arguing that that case concerned a firearm enhancement, which "has no substance absent

attachment to a principle [sic] term." The case, however, did not limit its application of the rule regarding enhancements to situations in which the enhancement is unrelated to the principal term. Alternatively, appellant relies on the court's description of the One Strike Law as an alternative sentencing scheme in *People v. Mancebo* (2002) 27 Cal.4th 735, 738, 741 (*Mancebo*), to argue that section 667.61 is not an enhancement, but that it simply "provides an 'alternative, harsher sentencing scheme' for those crimes that fall within its ambit." The court in *Mancebo*, however, had no occasion to consider whether a sentence imposed upon a finding of an applicable circumstance under the One Strike Law was an "enhancement," and certainly did not hold that the finding of an enumerated circumstance under that law was equivalent to an underlying substantive offense. We conclude the court had no sua sponte duty to instruct the jury regarding simple kidnapping.

### 5. False Imprisonment as a Lesser Included Offense of Human Trafficking

Appellant contends the trial court erred in failing to instruct the jury, sua sponte, on false imprisonment as a lesser included offense of human trafficking. Assuming, without deciding, that false imprisonment is a lesser included offense of human trafficking, we conclude the trial court in this case had no duty to sua sponte instruct the jury with false imprisonment.

A trial court has an obligation to instruct sua sponte on lesser included offenses where there is substantial evidence to support a jury finding that the lesser offense was committed, but not the greater. (*People v. Breverman* (1998) 19 Cal.4th 142, 154–155.) Instructions on lesser included offenses are not required unless supported by "evidence that a reasonable jury could find persuasive." (*People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8.) Consequently, the trial court need not instruct on a lesser included offense "when the evidence shows that the defendant is either guilty of the crime charged or not guilty of any crime." (*Id.* at p. 196, fn. 5.) In other words, even if an offense is a lesser included, a court need not give the instruction if there is insufficient evidence that the offense committed, if any, was less than that charged. (*People v. Duncan* (1991) 53 Cal.3d 955, 970.)

21

Here, there was no evidence that appellant kidnapped Doe for any reason other than to obtain her services as a prostitute in his employment, and later, to commit lewd acts against her. In appellant's view, "the evidence was not compelling that [his] control over Doe extended to pimping." He suggests that Dame may have been her pimp, and also suggests that because Doe was only able to name one client, "Manny," perhaps she was not even a prostitute. Doe, however, testified that appellant was her pimp, not Dame.

Appellant asserts the jury might not have convicted him of human trafficking if instructed on false imprisonment because it acquitted him of a violation of section 266j, Child Procurement. As appellant acknowledges, however, the jury was instructed under CALCRIM No. 1152 that one element of a charge under section 266j is that the child was under sixteen years of age at the time the defendant acted. In response to a question from the jury, the trial court further instructed that to convict under section 266j, the jury must find that the defendant knew the child was under the age of sixteen. Doe testified that after first telling appellant she was 19 years old, she later told him she was 17. Thus, the acquittal on the child procurement charge simply reflected that the jury did not find sufficient evidence to prove that appellant knew Doe's true age. It does not suggest that had the jury been instructed on false imprisonment, it would have acquitted appellant of human trafficking.

Moreover, we conclude that even if the trial court should have instructed the jury with false imprisonment, any error was harmless because it is not reasonably probable the jury would have found appellant guilty of false imprisonment instead of the charged offense if so instructed. (See *People v. Watson* (1956) 46 Cal.2d 818, 836; *People v. Breverman*, *supra*, 19 Cal.4th at p. 178 ["error in failing sua sponte to instruct, or to instruct fully, on all lesser included offenses and theories thereof which are supported by the evidence must be reviewed for prejudice exclusively under *Watson*"].) As noted above, all of the evidence established that appellant was Doe's pimp, that he kidnapped her for the purpose of being her pimp, and that he required Doe to engage in prostitution not long after he abducted her until the moment she was taken into police custody.

22

### 6. Admission of Two Prison Priors

Appellant contends that his admission of two prior prison term convictions was not knowing and voluntary because he was not fully advised of his constitutional rights. While the jury was deliberating, the trial court raised the issue of whether a further trial would be required on the allegation that appellant had served two prior prison terms.[11] Defense counsel responded, "We'll stipulate to the priors—to the prison priors. I believe there is two that are alleged. And I looked at the prison packet for the one and the certified court documents for the other and I'm satisfied that there is proof of those and Mr. Oliver would like to stipulate to both prison priors." The trial court asked, "Mr. Oliver, you've heard what your attorney has indicated; is that what you wish to do?" Appellant responded, "Yes, sir."

The trial court went on to state, "And I don't mean to belabor this point and we are jumping way ahead—putting the cart way ahead of the horse because in order—before this becomes really important is if the jury finds you guilty of any offense—if they find you not guilty of everything, then it's not an issue. If they do find you guilty and given the charges here that could result in a prison sentence, then these two alleged prior prison sentence convictions could add time to your prison sentence. You understand that?" Appellant replied, "Yes." The court stated, "So what the DA would do and would be ready to do is to roll your fingerprints right here in court. Have a fingerprint expert identify the prints on your hands as belonging to the ones that were on the prison packet that also has your photograph, that would be introduced to the jury, and then they'd make a determination. But by admitting or stipulating that you did in fact, suffer those prior convictions, you're giving up your right to a jury that would have to unanimously decide that you were in fact the person who suffered those convictions. You understand that?" Appellant responded, "Yes."

---

[11]The trial court initially raised the issue while settling jury instructions, but a plea was not formally discussed at that time. At that time, the court informed appellant he had a right to a trial on the issue and deferred further discussion pending appellant's consultation with his trial counsel.

23

The court asked appellant if he was waiving his right to a jury trial, to which appellant responded, "yes." The court asked defense counsel if he would "join in," and counsel responded, "I do." The court asked if the People joined in, and the prosecutor responded that she did. The court accepted the jury waiver and the stipulation of admission.

Under both the federal and state Constitutions, before a court accepts a guilty plea, a defendant must be advised of his rights to a jury trial and to confront witnesses against him and of the privilege against compelled self incrimination. (*Boykin v. Alabama* (1969) 395 U.S. 238, 242–243; *In re Tahl* (1969) 1 Cal.3d 122, 132–133.) In California, the same rule applies when a defendant admits an alleged prior conviction. (*In re Yurko* (1974) 10 Cal.3d 857, 863.) The failure to advise a defendant of his rights prior to his admission concerning a prior conviction allegation is not reversible per se. (*People v. Howard* (1992) 1 Cal.4th 1132, 1178.) The pertinent inquiry is whether "the record affirmatively shows that [the admission] is voluntary and intelligent under the totality of the circumstances." (*People v. Mosby* (2004) 33 Cal.4th 353, 360 (*Mosby*).) The focus of this examination is not, whether the defendant received express rights advisements, and expressly waived them, [but] whether the defendant's admission was intelligent and voluntary because it was given with an understanding of the rights waived. (*Mosby*, *supra*, 33 Cal.4th at p. 361.) In order to decide the issue, "an appellate court must go beyond the courtroom colloquy" and "examine the record of 'the entire proceeding' to assess whether the defendant's admission of the prior conviction was intelligent and voluntary in light of the totality of circumstances." (*Ibid*.)

*Mosby* distinguished between "silent-record" cases and "incomplete advisement" cases. (*Mosby*, *supra*, 33 Cal.4th at pp. 361–363.) The present case is an incomplete advisement case because the trial court advised appellant of his right to a jury trial but not his privilege against compelled self-incrimination and his right to confront adverse witnesses. (*Id*. at pp. 364–365.) In *Mosby*, the court advised the defendant that he was entitled to have a jury determine the truth of the prior felony conviction allegation. (*Id*. at p. 358.) The defendant waived that right and agreed to have the court determine

the truth of the prior conviction allegation. (*Id.* at pp. 357–358.) Following the jury's guilty verdict, the jury was discharged and the defendant admitted the prior conviction allegation. (*Id.* at pp. 358–359.) The defendant appealed, arguing that the trial court's incomplete rights advisements rendered his admission invalid. (*Id.* at p. 359.) The California Supreme Court ruled that the defendant had voluntarily and intelligently admitted his prior conviction. (*Id.* at p. 365.)

Here, as in *Mosby*, appellant, who was represented by counsel, had just experienced a jury trial. Moreover, appellant opted not to testify. Thus, he "not only would have known of, but had just exercised, his right to remain silent at trial, . . ." (*Mosby*, supra, 33 Cal.4th at p. 364.) Furthermore, because appellant had, "through counsel, confronted witnesses at that immediately concluded trial, he would have understood that at a trial he had the right of confrontation." (*Ibid*.) Appellant asserts in two footnotes that the plea was defective because he did not personally enter the admission of the priors. After defense counsel stated, "We'll stipulate to the priors," the trial court confirmed, "Mr. Oliver, you've heard what your attorney has indicated; is that what you wish to do?" and appellant replied "Yes, sir." Thus appellant expressly agreed that he was stipulating to the two prior prison term convictions. We fail to perceive a material distinction between appellant stipulating that he suffered two prior prison term convictions and appellant admitting that he suffered two prior prison term convictions.

In reviewing the entire record, appellant's experience with the criminal justice system is " 'relevant to the question [of] whether he knowingly waived constitutional rights.' [Citation.] That is so because previous experience in the criminal justice system is relevant to a recidivist's ' "knowledge and sophistication regarding his [legal] rights." ' [Citations.]" (*Mosby*, *supra*, 33 Cal.4th at p. 365, fn. omitted.) Appellant's two prior prison term convictions demonstrated experience in the criminal justice system. After a full trial in which appellant exercised his privilege against self-incrimination by electing not to testify and confronted the witnesses against him, he knowingly and voluntarily stipulated to the truth of the allegations he had suffered two prior prison term convictions.

## 7. Sentencing

Appellant contends that punishment for both the aggravated kidnapping circumstance under the One Strike Law and his conviction for human trafficking violates the prohibition against multiple punishment for the same conduct under sections 654 and 667.61, subdivision (f). We reject the contention.

"[S]ection 654 prohibits punishment for two crimes arising from a single indivisible course of conduct. [Citation.] If all of the crimes were merely incidental to, or were the means of accomplishing or facilitating one objective, a defendant may be punished only once. [Citation.] If, however, a defendant had several independent criminal objectives, he may be punished for each crime committed in pursuit of each objective, even though the crimes shared common acts or were parts of an otherwise indivisible course of conduct. [Citation.] The defendant's intent and objective are factual questions for the trial court, and we will uphold its ruling on these matters if it is supported by substantial evidence. [Citation.]" (*People v. Perry* (2007) 154 Cal.App.4th 1521, 1525.)

In *People v. Alvarado* (2001) 87 Cal.App.4th 178, the court reviewed a One Strike sentence imposed for a rape during a burglary (§ 667.61, subds. (b), (e)(2)) and a consecutive sentence imposed for a robbery committed during a burglary. The Court rejected the defendant's claim that the burglary and robbery shared the common objective of stealing, and it held that section 654 did not prohibit separate punishments. (*Id.* at p. 196–197.) Similarly, here, appellant was convicted of lewd acts against Doe and was sentenced under the One Strike Law because he committed those acts during an aggravated kidnapping. He was also charged and convicted of human trafficking for abducting Doe for the purpose of pimping or pandering. The objectives of the two offenses were separate and distinct. Appellant could have kidnapped Doe for the purpose of committing lewd acts without also forcing her to work for him as a prostitute. He could have abducted Doe in order to put her to work for him as a prostitute without committing lewd acts against her. Because the offenses had independent criminal objectives, section 654 did not protect appellant from being punished for human

26

trafficking as well as under the One Strike Law for committing lewd acts during an aggravated kidnapping.

We conclude that section 667.61, subdivision (f), also does not prohibit punishment under both the One Strike Law and for the offense of human trafficking.[12]  In *People v. Byrd* (2011) 194 Cal.App.4th 88, 92 (*Byrd*), a transient armed with a rifle kidnapped two boys who were driving a truck.  After driving for approximately fifteen minutes, the defendant let one of the boys go.  (*Id*. at p. 93.)  Later, the defendant directed the second victim to drive to a trailer, and there, defendant sodomized him at gunpoint.  (*Ibid*.)  With respect to the second victim, the prosecution charged the defendant with simple kidnapping and forcible sodomy of a minor along with the One Strike Law's aggravated kidnapping allegation.  (*Id*. at p. 94.)  The jury convicted the defendant on all counts and made true findings on the aggravated kidnapping allegation under the One Strike Law.  (*Ibid*.)  The trial court sentenced the defendant for simple kidnapping and imposed, but stayed, an indeterminate sentence for sodomy with the aggravated kidnapping enhancement.  (*Id*. at p. 95.)

On appeal, the defendant argued the trial court erred in imposing a sentence for simple kidnapping because aggravated kidnapping was the only qualifying circumstance used to sentence him under the One Strike Law; therefore, section 667.61, subdivision (f), prohibited the sentence for simple kidnapping in count 1.  (*Byrd*, *supra*, 194 Cal.App.4th at pp. 95–97.)  The court held the trial court's sentence was authorized because section 667.61 distinguished between simple kidnapping and aggravated kidnapping as different circumstances, and this distinction permitted the trial court's sentence for simple kidnapping in count 1.  (*Id*. at pp. 101–102.)  In so holding, the court

---

[12]Section 667.61, subdivision (f), provides in part:  "If only the minimum number of circumstances specified in subdivision (d) or (e) that are required for the punishment provided in subdivision (a), (b), (j), (l), or (m) to apply have been pled and proved, that circumstance or those circumstances shall be used as the basis for imposing the term provided in subdivision (a), (b), (j), (l), or (m) whichever is greater, rather than being used to impose the punishment authorized under any other provision of law, unless another provision of law provides for a greater penalty or the punishment under another provision of law can be imposed in addition to the punishment provided by this section."

noted that while the version of section 209 that was in effect at the time prohibited punishment for the same act being punished under section 667.61, section 207 did not have the same language.

Similarly, here, there is nothing in the human trafficking statute that prohibits punishment where a One Strike sentence is imposed. Moreover, only one circumstance—aggravated kidnapping—was pled and proved, and that circumstance was separate and distinct from the human trafficking offense. Just as the court in *Byrd* found a difference between the simple kidnapping and aggravated kidnapping, we also find that human trafficking for the purpose of forcing her to work for him as a prostitute is different from aggravated kidnapping for the commission of sex crimes. Accordingly, it was not error for the trial court to punish appellant for both the aggravated kidnapping circumstance under the One Strike Law and for his conviction for human trafficking.

### DISPOSITION

The judgment is affirmed.

_____
McGuiness, P.J.

We concur:

_____
Jenkins, J.

_____
Pollak, J.

28